















VLS   7/28/03   10:17

3:01-CV-01387   GOLDSTEIN V. METABOLIFE INTL INC

*104*

*MEMFACTS.*

1    DUNBAR & ASSOCIATES
     J. Mark Dunbar, Esq. (Bar No. 149121)
2    Torrey Financial Building
     1205 Prospect Street, Suite 400
3    La Jolla, California 92037-3612
     (858) 454-4990 Telephone
4    (858) 454-5250 Facsimile

5    HOLLAND & HART LLP
     Douglas L. Abbott, Esq.
6    (Colo. Bar No. 18683)
     Gregory R. Clouser, Esq.
7    (Colo. Bar No. 34138)
     555 Seventeenth Street, Suite 3200
8    Denver, Colorado 80202-3979
     (303) 295-8000 Telephone
9    (303) 295-8261 Facsimile

10    Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL GOLDSTEIN, NEW CENTURY HEALTH ENTERPRISES, INC., a Colorado corporation, DONALD BROWN, JR., GREGORY LOCKE, and MARK COUGHLIN, <br><br> Plaintiffs, <br><br> v. <br><br> METABOLIFE INTERNATIONAL, INC., a California corporation, MICHAEL ELLIS, SCOTT MOBERLY, W. ROBERT BRADLEY, AND MICHAEL BLEVINS, <br><br> Defendants. | 01 CV 1387 JM (POR) <br><br> **PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF LAW AND FACT** <br><br> Ctrm: Hon. Jeffrey T. Miller <br> Complaint: July 27, 2001 |

Pursuant to Civ.L.R.16.1(f)(2) and (3)(c), Plaintiffs Michael Goldstein, New Century Health Enterprises, Inc., a Colorado Corporation, Donald Brown, Jr., Gregory Locke, and Mark Coughlin, (collectively "Plaintiffs") submit their Memorandum of Contentions of Law and Fact.

## I.    CONTENTIONS OF FACT

1.    In 1998, the four Plaintiffs signed written contracts with Metabolife International, Inc. ("Metabolife") to become "Premier Distributors" of Metabolife products.  Metabolife is a company that sells various diet supplements, primarily a product in pill form known as Metabolife 356.

2.    Premier Distributors were awarded the exclusive right to sell Metabolife in specific malls or other locations.  Plaintiffs sold from kiosks located in the malls and some plaintiffs had storefront locations.

3.    The two principal documents that form the Plaintiffs' written contracts with Metabolife are the Premier Distributor Agreement ("PDA") and the Distributor Guidelines ("Guidelines"), which are incorporated into the PDA.  Plaintiff Donald Brown, Jr. entered into his agreement on or about February 16, 1998.  Plaintiff Mark Coughlin entered into his agreement on or about March 12, 1998.  Plaintiff Gregory Locke entered into his agreement on or about July 7, 1998.  Plaintiff Michael Goldstein entered into his agreement on or about August 4, 1998.

4.    The contracts of Plaintiffs Brown and Coughlin differ from the contracts of Plaintiffs Locke and Goldstein.  The contracts of Plaintiffs Goldstein and Locke contain what is known as "National Accounts" language, which is not found in the contracts of Plaintiffs Coughlin and Brown.

5.    Defendant Blevins testified that the "National Accounts" language was inserted in 1998 in cooperation with a consultant to preserve Metabolife's right to "go retail," which meant that Metabolife could bypass the distributors in favor of selling directly to mass retailers such as Wal-Mart.  However, this purpose was not

communicated to the Plaintiffs, and Metabolife has produced no other evidence that the "National Accounts" language was intended to have that meaning.

6.     The Plaintiffs signed contracts to become Metabolife distributors because Metabolife held itself out as dedicated to selling its product through a multi-level marketing ("MLM") system, which eschews traditional retail sales in favor of sales through individual distributors.

7.     The Plaintiffs' contracts repeatedly reinforce that Metabolife's sales model was contrary to retail sales. For instance, the Guidelines tout the benefits of the MLM sales model and deride traditional retail sales. The Guidelines state that Metabolife "is a global multi-level marketing effort," which "involves the creation of a network of independent distributors... without the use of the typical merchandise distribution facilities (such as retail stores)." The Guidelines further provide that "[t]hrough the development of a multi-level marketing network, Metabolife accomplishes its object of bringing its products to the ultimate consumer at the lowest possible cost, without the overhead and advertising expenses typically associated with retail sales...." The contract also emphasizes that "[t]hese products cannot be purchased in any store and are only available directly from an authorized Metabolife distributor."

8.     Further, the Guidelines declare that "Metabolife is a direct sales company" whose "success is based on our distributors selling directly (one on one) to the consumer . . . ." In keeping with this way of business, the Guidelines expressly prohibited sales of Metabolife through retail stores, because doing so "would give an unfair advantage to the retail store owner and would unreasonably interfere with the ability of other distributors in the area to make sales to consumers."

9.    Plaintiffs understanding of their agreement and the ban on retail sales comes from these express provisions of the contract.  The Defendants subsequently made repeated representations that Metabolife would not and could not go retail, which further reinforced Plaintiffs' understanding of their contracts and confirmed Metabolife's own intent.

10.    As Premier Distributors, the Plaintiffs had a protected radius around each mall or store location.  Each of the Plaintiffs worked hard at developing their Metabolife businesses and opened several locations in malls across the country.  Each of them devoted themselves to developing their businesses and each was very successful.

11.    In October of 1999 and May of 2000 the ABC news program 20/20 aired programs on Metabolife and its products.  The story revealed Defendant Ellis' criminal background and warned of potential health risks from using Metabolife 356.  At about the same time, sales temporarily declined.

12.    Shortly after the Plaintiffs became Premier Distributors in 1998 and in the years that followed, rumors circulated that Metabolife was "going retail."  The Plaintiffs were concerned and sought reassurances from Defendants and other Metabolife employees that Metabolife was not "going retail."

13.    Plaintiffs were told by Defendants that Metabolife was committed to its distributors, and that Metabolife would not "go retail."  Plaintiffs were told by Defendants and Metabolife employees that retail sales were precluded altogether by the terms of their contracts, and that they should not worry.

14.    Based on these statements, Plaintiffs continued to pour their time, energy, and money into their investment, believing that Metabolife would not "go retail."



15.    However, on July 29, 2000, at a meeting in San Diego, Metabolife announced suddenly that effective August 1, 2000, Metabolife was "going retail."

16.    The Plaintiffs were stunned because they believed their contracts prohibited retail sales, and because Defendants and other Metabolife employees had consistently supported this interpretation with representations that Metabolife was not planning to "go retail."

17.    At the meeting, Metabolife offered an addendum to Plaintiffs' Premier Distributorship Agreement. This addendum required Premier Distributors to release all claims against Metabolife, agree to arbitration of all disputes, and to recognize Metabolife's right to "go retail" in exchange for a monthly "consultant" payment.

18.    The Addendum claimed that Metabolife's right to "go retail" was based only in the National Accounts language that is found in Locke's and Goldstein's contracts but which is not found in Brown's or Coughlin's contracts.

19.    A distributor who signed the agreement could then purchase Metabolife 356 for $17.99 a bottle, while those who refused to sign the agreement had to pay $22.47 per bottle.

20.    Plaintiffs refused to sign the addendum, believing it was coercive, would eviscerate their prior agreement and their ability to seek legal redress, and lead to their financial downfall.

21.    Plaintiffs' mall kiosks were subsequently surrounded by numerous retail stores selling Metabolife at prices below $22.47.

22.    Plaintiffs kept their kiosks open for a short time after the July 29 meeting, but soon recognized that they could not compete with the retail stores who could

purchase the product from Metabolife for $4.48 less per bottle than the price offered to Plaintiffs.

23.    Plaintiffs were forced out of business because they could not compete with the lower prices charged by huge national retail chains surrounding their mall locations.

24.    As a result of Defendants' actions, Plaintiffs were forced out of business and suffered damages.  A complete summary of Plaintiffs' damages are found in their expert's report, which is separately attached to this Memorandum.

## II.    CONTENTIONS OF LAW

### Metabolife's Decision to "Go Retail" Was a Breach of Contract

25.    The elements of a breach of contract include: (1)  the existence of a valid contract; (2) defendant's knowledge of the contract and intent to cause the breach; (3) a breach of the contract by a contracting party; (4) which was caused by the defendant's wrongful conduct; and (5) damages suffered as a result.  *Charles C. Chapman Bldg. Co. v. California Mart*, 2 Cal.App.3d 846, 853 (1969).

26.    Under California law, the whole of the contract is to be considered, so as to give effect to every part if reasonably practicable, with each clause helping to interpret the other.  Cal. Civ. Code § 1641.

27.    Courts must give a reasonable and commonsense interpretation of a contract consistent with the parties' apparent intent, and may not interpret a contract so as to render one of its terms meaningless. *People ex. rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal. App. 4th 516, 526 (2003); *Kavruck v. Blue Cross of California*, 108 Cal. App. 4th 773, 783 (2003).



28.     "A contract entered into for the mutual benefit of the parties is to be interpreted so as to give effect to the main purpose of the contract and not to defeat the mutual objective of the parties." *Leo F. Piazza Paving Co. v. Foundation Constructors, Inc.*, 128 Cal. App. 3d 583, 591 (1981).

29.     Subsequent conduct of the parties can be considered in interpreting the contract. *Morey v. Vannucci*, 64 Cal. App. 904, 912 (1998).

30.     To the extent these rules of interpretation do not resolve the uncertainty, a contract must be construed against the drafter. Cal. Civ. Code § 1654.

31.     Plaintiffs and Metabolife had a valid contract. Metabolife breached the contract by "going retail" despite the contract's language against retail sales and the parties' expectations to the contrary.

32.     Defendants' primary contention is that economic circumstances brought on by competition from other "knock-off" products forced them to go retail. Though this is not a valid defense to a breach, the evidence will be that this was not the cause; rather, Metabolife experienced a decline in sales from adverse publicity about the product, and Metabolife's founder, Michael Ellis.

**Defendant Breached the Covenant of Good Faith and Fair Dealing**

33.     One party to a contract does not have unfettered discretion to affect the rights of another party to the contract. *Chodos v. West Publishing Co.*, 292 F.3d 992, 996-97 (9th Cir. 2002). A party's discretion is limited by the implied covenant of good faith and fair dealing. *Id.*; *Badie v. Bank of America*, 67 Cal. App. 4th 779, 795 (1998).

34.     The covenant imposes a duty on a party to a contract not to deprive the other party of the benefit of the contract. *Sutherland v. Barclays American/Mortgage Corp.*, 53 Cal. App. 4th 299, 314 (1997). This covenant finds particular application

where one party has discretionary power affecting the rights of another. *Chodos*, 292

F.3d at 997; *Sutherland*, 53 Cal. App. 4th at 314. The nature and extent of the duty

depends on the contractual purposes and the legitimate expectations of the parties

arising from the contract's terms. *Careau & Co. v. Security Pacific Business Credit,

Inc.*, 222 Cal. App. 3d 1371, 1393 (1990); *Acree*, 92 Cal. App. 4th at 395.

35. Even if the court finds that the contract is silent on the issue of whether

Metabolife could go retail, it is still possible to find that Metabolife breached the

implied covenant of good faith and fair dealing. *See Marsu, B.V. v. Walt Disney Co.*,

185 F.3d 932, 937 (9th Cir. 1999)(breach of a specific provision is not a necessary

prerequisite to the breach of the implied covenant).

36. The Plaintiffs had legitimate expectations, based on their contracts and

Defendants' representations, that Metabolife was not planning to "go retail."

37. Metabolife had a duty to exercise its power to amend the rules of

distributorship so as not to frustrate the legitimate expectations of Plaintiffs.

38. Metabolife's decision to "go retail" frustrated the purpose of the contracts

and the legitimate expectations of the Plaintiffs and was a breach of the covenant of

good faith and fair dealing.

### Defendants Intentionally Concealed Material Facts and Made Material Misrepresentations About Its Intent to "Go Retail"

39. A cause of action for nondisclosure arises when (1) the defendant makes

representations but does not disclose facts which materially qualify the facts disclosed,

or which render his disclosure likely to mislead; or (2) the facts are known or accessible

only to the defendant, and defendant knows they are not known to or reasonably

discoverable by the plaintiff. *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.*, 6 Cal.

App. 4th 603, 613 (1992).

40.    A duty of disclosure arises "when one party to a transaction has sole knowledge or access to material facts and knows that such facts are not known to or reasonably discoverable by the other party." *Goodman v. Kennedy*, 18 Cal. 3d 335, 347 (1976); *Limandri v. Jenkins*, 52 Cal. App. 4th 326, 337 (1997)(duty to disclose arises from contractual relationship).

41.    A cause of action for fraudulent misrepresentation requires a showing that the defendant (1) made a misrepresentation of a past or existing fact; (2) with knowledge of its falsity; (3) and with the intent to defraud or induce reliance; (4) justifiable reliance by the plaintiff; and (5) resulting damage. *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996).

42.    Defendants intentionally concealed material facts about their past and present intent to "go retail" and made repeated material misrepresentations to the Plaintiffs denying any such intent.

43.    Defendants have argued that their right to "go retail" derives from "national accounts" language, which is found in only two of the Plaintiffs' contracts. According to Defendant Blevins, this language was knowingly inserted by Defendants in late 1998 to reserve to Metabolife the right to "go retail." Plaintiffs dispute that this language gives Metabolife the right to sell to national retailers. However, if the Defendants are to be believed, then the insertion of this language is evidence of their intent, as early as 1998, to "go retail."

44.    Even after this language was inserted for the ostensible purpose of reserving to Metabolife the right to "go retail," Defendants concealed their intent behind this language from the Plaintiffs, and concealed their plans to "go retail." Further, Defendants continually denied that there was language in the contract that gave

them the right to go retail, and denied that Metabolife was planning to "go retail" after repeated inquiries by Plaintiffs.

45.     Defendants had a duty to disclose its intent behind the "national accounts" language.

46.     Plaintiffs justifiably relied on Defendants' misrepresentations and, as a result, continued to pour their time, effort, and money into their Metabolife distributorships.

47.     Defendants continued to deny and conceal from 1999 until July 29, 2000, when Metabolife finally revealed that it was "going retail."

48.     Defendants should have revealed their plan to "go retail" when the decision was first made in May 2000.

49.     As a result of these misrepresentations and concealment, Plaintiffs suffered damages.

**Defendants Negligently Misrepresented That It Was Not "Going Retail"**

50.     A negligent misrepresentation is "'[t]he assertion of a fact, of that which is not true, by one who has *no reasonable grounds for believing it to be true*.'" 5 Witkin Summary of Cal. Law Torts § 722 (9th ed. 2002)(*quoting* Cal. Civ. Code § 1710(2)).

51.     The elements of a negligent misrepresentation are: (1) misrepresentation of a past or present fact; (2) without reasonable grounds for believing it to be true; (3) with intent to induce reliance on the fact misrepresented; (4) ignorance of the truth and justified reliance; and (5) damages. *Fox v. Pollack*, 181 Cal. App. 3d 954, 962 (1986).

52.     Defendants' statements denying their intention to "go retail" were negligent misrepresentations.  The Defendants contend that they inserted the "national

x                          01CV1387 JM (POR)

accounts" language to reserve the right to "go retail." Yet the Defendants made statements to the Plaintiffs that Metabolife was not planning to "go retail." These denials were made without reasonable grounds for believing the truth of the statements.

53. Defendants knew the denials were not true because they allege that they inserted the "national accounts" language for the express purpose of "going retail." Thus, Defendants misrepresented a past or present fact, without any reasonable grounds for believing it to be true, with the intent to induce Plaintiffs to rely on the misrepresentation.

54. Plaintiffs were ignorant of the truth, and were justified in believing the Defendants, and suffered damages as a result.

**Defendants Violated the Colorado Consumer Protection Act**

55. The elements of a claim under the Colorado Consumer Protection Act are (1) defendant engaged in an unfair or deceptive trade practice; (2) which occurred in the course of defendant's business; (3) and significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) the plaintiff suffered injury in fact to a legally protected interest; and (5) the challenged practice caused the plaintiff's injury. *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998).

56. Defendants engaged in an unfair or deceptive trade practice by failing to disclose to Plaintiff Michael Goldstein that ambiguous language in his contract was inserted by Metabolife for the express purpose of someday allowing Metabolife to "go retail" while representing to the public that Metabolife would not "go retail." As a result of this deception, Goldstein entered into the contract without knowing Metabolife's true intent. If Plaintiff Goldstein had known of Metabolife's intent, he never would have entered the contract. Because Plaintiff Goldstein did not know

Metabolife had reserved the right to go retail, he poured his time and money into his distributorship, which lost its value after Metabolife announced its decision to "go retail."

### Defendants Violated New York General Business Law Section 349

57.     A claim under New York General Business Law § 349 requires a showing that: (1) the defendant engaged in an act that was deceptive or misleading in a material way; (2) a reasonable consumer would have been misled by the defendant's conduct; and (3) the defendant's acts caused the plaintiff injury.

58.     Plaintiff Coughlin's contract with Metabolife did not include any "National Accounts" language, nor did Metabolife ever tell Plaintiff Coughlin that it was inserting that language into subsequent Premier Distributorship Agreements.  The Defendants have admitted that the purpose of that language was to reserve the right to "go retail." Defendants made material misrepresentations to Plaintiff Coughlin after he asked them whether Metabolife had any plans or intentions to "go retail."  Plaintiff Coughlin was misled by Defendants' misrepresentations and relied on their statements by opening new kiosks, purchasing a new home, and having his wife quit her job. Defendants' misleading statements about their intent to "go retail" harmed Plaintiff Coughlin after they publicly announced their plans on July 29, 2000, and his kiosks lost their value.

### Defendants Violated the Robinson Patman Act

59.     A claim under the Robinson Patman Act, 15 U.S.C. § 13 (2002), provides that it is unlawful for a seller of commodities or goods to discriminate between different purchasers of goods of like grade and quality, when such purchasers are themselves competitors of one another. In addition, the Act prohibits price

discrimination where the effect of such discrimination may be to substantially lessen competition, "or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customer of either of them."

60.    The elements of a claim are: (1) discrimination must occur in interstate commerce; (2) involving a sale to at least two different purchasers; (3) at two different prices; (4) of commodities of like grade and quality; (5) within a reasonably contemporaneous time; (6) with the effect of substantially lessening competition. *Texaco Inc. v. Hasbrouck*, 496 U.S. 543 (1990); *Rutledge v. Electric Rose & Rubber Co.*, 511 F.2d 668 (9th Cir. 1975).

61.    Here, Plaintiffs purchased identical Metabolife products in interstate commerce, at or about the same time as mass market retail stores.  The Plaintiffs were forced to pay $22.47 per bottle while the mass retailers were given a substantially lower price of $17.99 per bottle.  As a result of the significant price differential for the same product, Plaintiffs could not compete and were forced to close their mall kiosks.

### III.    Abandoned Issues

62.    Plaintiffs are no longer pursuing their original claims under the California Franchise Investment Law, §§ 31201, 31301, and the common law claim of unjust enrichment.

### IV.    Witnesses

63.    Michael Goldstein

64.    Gregory Locke

65.    Donald Brown, Jr.

66.    Mark Coughlin

67. Michael Ellis

68. Scott Moberly

69. Michael Blevins

70. W. Robert Bradley

71. Brian Brinig

## V.   Exhibits

A list of exhibits that Plaintiffs expect to offer at trial is attached.

Dated July 25, 2003.

Respectfully submitted,

HOLLAND & HART, LLP

*Douglas L. Abbott – AH*
Douglas L. Abbott
Gregory R. Clouser

**ATTORNEYS FOR PLAINTIFFS**



Goldstein, et al. v. Metabolife, et al.

F.R.C.P. 26 (a)(2)(B) Report

May 19, 2003

BRINIG & COMPANY
INCORPORATED
VALUATION AND FINANCIAL CONSULTANTS

101 WEST BROADWAY, SUITE 1370
SAN DIEGO, CALIFORNIA 92101-3742
(619) 687-2600

# BRINIG & COMPANY
### INCORPORATED
#### VALUATION AND FINANCIAL CONSULTANTS

101 WEST BROADWAY, SUITE 1650

SAN DIEGO, CALIFORNIA  92101-8290

TEL. (619) 687-2600  FAX (619) 544-0304

www.brinigco.com

May 19, 2003

Douglas L. Abbott, Esq.
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, CO 80201-8749

Re:    Goldstein, et al.  vs.  Metabolife International, Inc., et al.
        Written Report of Expert Testimony (Federal Rule of Civil Procedure 26(a)(2)(B)).

Dear Mr. Abbott:

This letter constitutes my report in the above-referenced matter and it states my opinion of the economic loss to each of the plaintiffs (Gregory Locke, Michael Goldstein (New Century Health Enterprises, Inc.), Mark Coughlin and Donald Brown, Jr.) as a result of alleged breach of contract by defendant, Metabolife International, Inc., et al.  I have no opinion regarding liability in this matter.

## BACKGROUND FACTS

By way of background, Metabolife International, Inc. ("Metabolife") produces a popular dietary supplement, "Metabolife 356" and a variety of other edible dietary supplements.  In 1998, plaintiffs approached Metabolife to inquire about becoming Metabolife distributors.  Plaintiffs entered into Premier Distributor Agreements with Metabolife in that year.

Once plaintiffs became Metabolife distributors, they leased "kiosks" from landlords at Metabolife approved locations.  Plaintiffs invested heavily in Metabolife mandated fixtures, equipment and advertising.  Also, plaintiffs devoted substantial resources, time and effort into training employees, developing consumer brand awareness and building demand for Metabolife's products.  Through the successful efforts of plaintiffs, defendants and other distributors from 1998 to August 1, 2000, public perception, brand awareness and sales volume of Metabolife products rose significantly.



In a meeting held on July 29, 2000, defendants abruptly announced to plaintiffs and all other distributors that Metabolife would begin marketing its products through large retail chains nationwide, allegedly in violation of Metabolife's contract with plaintiffs. On August 1, 2000, Metabolife products appeared on retail shelves nationwide. Plaintiffs could not compete with sales in retail locations. As a result, plaintiffs claim that they were forced out of business within a few months.

## ECONOMIC LOSS ANALYSIS

<u>Lost Profits:</u>  Generally, our economic analysis of each plaintiff's business is based on the annualized seven months of operations in the year in which the alleged breach of contract occurred. Each plaintiff began its relationship with Metabolife International, Inc. in 1998, starting kiosk-type businesses at various locations during the calendar year of 1998 and also 1999. Consequently, 1999 is the first calendar year of full operations for each plaintiff's business. Based on the 1999 income statement and the income statement for the seven months ended July 31, 2000 for each plaintiff and other income data, we analyzed the revenues and expenses to determine the adjusted net income for each period. (The income analysis of each plaintiff includes different adjustments; see schedule 3 and the accompanying notes in each of the Exhibits A through D attached to this report for the detailed analysis of each plaintiff's adjusted net income for 1999 and the seven months ended July 31, 2000.) The annualized, adjusted net income for the seven months ended July 31, 2000 was used as a basis for the projected net income lost by each plaintiff after the date of the alleged breach of contract, July 29, 2000.

For each plaintiff, we have performed loss calculations for three time periods from the alleged breach of contract: one year loss, three year loss and five year loss. We have also made our calculations under one growth assumption scenario in consideration of the three year trend of gross revenues of Metabolife International, Inc. from 2000 through 2002.

The specific calculations of lost profits are set forth in schedule 2 of Exhibits A through D of this report. The schedule presents the calculations of both past lost profits and present value of future lost profits in one, three and five year time periods. All future projections are discounted to present value at a 33% discount rate, a discount rate that is considered appropriate for this type of business.

<u>Metabolife International, Inc.:</u>  The financial performance of Metabolife International, Inc. during the time frame of this dispute is noteworthy. Schedule E-1 shows the annual income statement for Metabolife from 1999 to 2001.

Overall, Metabolife's income statement for this three year period shows a very profitable company in the face of fluctuating sales. Annual sales fluctuated from a high of $350,540,040 in 1999, to a low of $221,473,642 in 2000 and $258,614,912 in 2001. In this period, the company earned net income that ranged from $24,811,897 (7.1% of total sales) in 1999 to $19,239,585 (7.4%) in 2001. The net income was $23,218,705 (10.5%) in 2000. On an operating income



BRINIG & COMPANY
INCORPORATED

Douglas L. Abbott, Esq.
May 19, 2003
Page 3

basis, the company recorded income of $24,288,903 (6.9%) in 1999, $33,412,191 (15.1%) in 2000 and $19,685,245 (7.6%) in 2001. Based on our analysis, the performance of the company improved in the year of the breach, 2000, and in 2001. Operating income and net income in 2000 and 2001, expressed as a percentage of total sales, were higher than that recorded in 1999.

## CONCLUSIONS

Based on the rationale set forth in this report and the analysis we have performed, it is our opinion that the economic loss sustained by plaintiffs is as follows. The calculations are set forth on Schedules A-1 through D-3 (See Tabs A through D) and the narrative is set forth in the Economic Loss Analysis section.

|                      | 1 Year     | 3 Years      | 5 Years      |
|----------------------|------------|--------------|--------------|
| Locke                | $73,035    | $158,565     | $187,880     |
| Goldstein            | $221,069   | $479,960     | $568,692     |
| Coughlin             | $206,102   | $447,466     | $530,191     |
| Brown                | $268,860   | $583,719     | $691,634     |
| Total All Plaintiffs | $769,066   | $1,669,710   | $1,978,397   |

## DOCUMENTS REVIEWED

In the course of our analysis, we have reviewed the following documents:

Complaint for Damages.

Financial Documents Relating to Gregory Locke's Metabolife Business.

Financial Documents Relating to Michael Goldstein's Metabolife Business.

Financial Documents Relating to Mark Coughlin's Metabolife Business.

Financial Documents Relating to Donald Brown's Metabolife Business.

Premier Distributor Agreement (signed by all plaintiffs).

Distributor Guidelines, Metabolife International, Inc.



BRINIG & COMPANY
INCORPORATED

Douglas L. Abbott, Esq.
May 19, 2003
Page 4

Various Lease Agreements.

Stipulation and Protective Order.

Various Metabolife International, Inc.'s Responses to Discovery.

Plaintiff's Responses to Interrogatories.

Metabolife International, Inc. Statistical Charts (Graphs of financial performance).

Metabolife International, Inc. Monthly and General Sales Data 1998 to 2001.

Metabolife International, Inc. and BE Marketing, Inc. Financial Report for fiscal year ended December 31, 1999.

Metabolife International, Inc. and Subsidiary Financial Report for fiscal year ended December 31, 2000 (without Supplemental Information).

Metabolife International, Inc. and Subsidiary Financial Report for fiscal year ended December 31, 2001 and 2000 (without Supplemental Information).

## ASSUMPTIONS AND LIMITING CONDITIONS

This report is subject to the following assumptions and limiting conditions:

1. This report was prepared for the use of Douglas L. Abbott, Esq. in connection with pending litigation known as Goldstein, et al. vs. Metabolife International, Inc., et al.

2. All facts and data as set forth in this report are true and accurate to the best of the author's knowledge and belief. No matters affecting the conclusions have knowingly been withheld or omitted.

3. The fee charged for this report is not contingent upon the outcome of this matter.

4. Brinig & Company, Inc. has accepted the financial statements and tax return data for the business entities operated by the plaintiffs without additional verification. The responsibility for the accuracy of all of the documents is retained by the management of each entity/plaintiff.

5. Brinig & Company, Inc. has relied on representations made by Mr. Goldstein, Mr. Brown, Mr. Coughlin and Mr. Locke about the background and history of their respective businesses. These representations are believed to be reliable but no responsibility is assumed by Brinig & Company, Inc. for their accuracy.



BRINIG & COMPANY
INCORPORATED

Douglas L. Abbott, Esq.
May 19, 2003
Page 5

6.  The analysis and its conclusions are subject to review upon the presentation of data which may have been undisclosed or not available at this writing.

My professional resume is attached as Exhibit F (See Tab F) and my list of expert testimony is attached as Exhibit G (See Tab G).  My hourly rate is $275.

Respectfully submitted,

Brian P. Brinig
Brinig & Company, Inc.

PAZ: rg
Enclosures

BRINIG & COMPANY
INCORPORATED

SCHEDULE A-1

# GOLDSTEIN, et al. vs. METABOLIFE INTERNATIONAL, INC., et al.

## ECONOMIC LOSS CALCULATIONS - LOCKE

General Information:

| | |
|---|---|
| Date of Valuation: | 04/30/2003 |
| Date of Premier Distributor Agreement:  [E1.2] | 08/13/1998 |
| Date Metabolife announces "retail" plan to distributors:  [E1.6] | 07/29/2000 |

## SUMMARY

| | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| Past Loss of Profits | $73,035 | $151,996 | $151,996 |
| Future Loss of Profits (PV) | --- | 6,569 | 35,883 |
| Total Economic Loss | $73,035 | $158,565 | $187,880 |

BRINIG & COMPANY
INCORPORATED

### SCHEDULE A-2

# GOLDSTEIN, et al.  vs.  METABOLIFE INTERNATIONAL, INC., et al.

## ECONOMIC LOSS CALCULATIONS - LOCKE

General Information:

| | |
|---|---|
| Date of Valuation: | 04/30/2003 |
| Date of Premier Distributor Agreement:  [E1.2] | 08/13/1998 |
| Date Metabolife announces "retail" plan to distributors:  [E1.6] | 07/29/2000 |

**LOST PROFITS**                                                    **1, 3, 5 Years**

**Assumptions:**

| | | |
|---|---|---|
| Rep. Annual Net Profits | | $66,550 |
| Growth Rates: | 2001 | 16.8% |
| | 2002 | -52.2% |
| | 2003+ | -25.3% |
| Discount Rate | | 33% |

| Period [1] | | | # Years | Adjusted Representative Annual Net Profits | Period Loss | Discount Rate | Present Value |
|---|---|---|---|---|---|---|---|
| **1 YEAR** | | | | | | | |
| 08/01/2000 | to | 12/31/2000 | 0.4 | $66,550 | $27,951 | | $27,951 |
| 01/01/2001 | to | 07/31/2001 | 0.6 | 77,731 | 45,084 | | 45,084 |
| | | | 1.0 | 1 Year Loss of Past Net Profits | | | $73,035 |
| | | | | | | | |
| **3 YEARS** | | | | | | | |
| 08/01/2001 | to | 12/31/2001 | 0.4 | $77,731 | $32,647 | | $32,647 |
| 01/01/2002 | to | 12/31/2002 | 1.0 | 37,155 | 37,155 | | 37,155 |
| 01/01/2003 | to | 04/30/2003 | 0.3 | 27,755 | 9,159 | | 9,159 |
| | | | | 2.7 Year Loss of Past Net Profits | | | $151,996 |
| | | | | | | | |
| 05/01/2003 | to | 07/31/2003 | 0.3 | $27,755 | $6,939 | 33% | $6,569 |
| | | | 3.0 | 0.3 Year Loss of Future Net Profits (PV) | | | $6,569 |
| | | | | | | | |
| | | | | 3 Year Total Loss of Net Profits (PV) | | | $158,565 |
| | | | | | | | |
| **5 YEARS** | | | | | | | |
| 08/01/2000 | to | 04/30/2003 | 2.7 | 2.7 Year Loss of Past Net Profits | | | $151,996 |
| | | | | | | | |
| 05/01/2003 | to | 12/31/2003 | 0.7 | $27,755 | $18,596 | 33% | $16,469 |
| 01/01/2004 | to | 12/31/2004 | 1.0 | 20,733 | 20,733 | 33% | 14,407 |
| 01/01/2005 | to | 07/31/2005 | 0.6 | 15,488 | 8,983 | 33% | 5,008 |
| | | | 5.0 | 2.3 Year Loss of Future Net Profits (PV) | | | $35,883 |
| | | | | | | | |
| | | | | 5 Year Total Loss of Net Profits (PV) | | | $187,880 |

[1]  From 8/1/00; date of breach of distributor agreement assumed to be 7/29/00.

Gregory R. Locke
Comparative Income Statements per Financial Statements - 2000
[Note 1]

| | [2.10a] Star Metabolife Internal F/S | | [2.40] Raywen Ent., Inc. Form 1120S | |
|---|---:|---:|---:|---:|
| **INCOME** | | | | |
| Gross Sales | $225,578 | 26.2% | $597,770 | 69.4% |
| Returns and Allowances | 160 | 0.0% | 4,494 | 0.5% |
| Net Sales | 225,418 | 26.2% | 593,276 | 68.9% |
| **COST OF GOODS SOLD** | | | | |
| Beginning Inventory | 0 | 0.0% | 20,859 | 2.4% |
| Purchases | 0 | 0.0% | 314,237 | 36.5% |
| Cost of Labor | 0 | 0.0% | 0 | 0.0% |
| Materials and Supplies | 0 | 0.0% | 0 | 0.0% |
| Other Costs | 0 | 0.0% | 1,981 | 0.2% |
| Ending Inventory | 0 | 0.0% | 0 | 0.0% |
| Total Cost of Goods Sold | 110,810 | 12.9% | 337,077 | 39.2% |
| **GROSS PROFIT** | 114,608 | 13.3% | 256,199 | 29.8% |
| **EXPENSES** | | | | |
| Advertising | 0 | 0.0% | 45 | 0.0% |
| Car and Truck Expenses | 0 | 0.0% | 3,928 | 0.5% |
| Insurance | 362 | 0.0% | 1,228 | 0.1% |
| Legal and Professional Services | 0 | 0.0% | 2,296 | 0.3% |
| Office Expense | 0 | 0.0% | 652 | 0.1% |
| Salaries and Wages | 43,274 | 5.0% | 98,879 | 11.5% |
| Salaries and Wages - Mgt | 14,000 | 1.6% | | |
| Vehicle, Machinery and Equipment Rent/Lease | 891 | 0.1% | 8,297 | 1.0% |
| Other Business Property Rent/Lease | 30,335 | 3.5% | 64,707 | 7.5% |
| Repairs and Maintenance | 0 | 0.0% | 0 | 0.0% |
| Supplies | 818 | 0.1% | 0 | 0.0% |
| Taxes and Licenses | 7,009 | 0.8% | 21,569 | 2.5% |
| Interest | 0 | 0.0% | 18 | 0.0% |
| Depreciation | 0 | 0.0% | 5,276 | 0.6% |
| Travel | 0 | 0.0% | 4,465 | 0.5% |
| Meals and Entertainment | 0 | 0.0% | 2,280 | 0.3% |
| Other Expenses | | | | |
| Bank Charges and Credit Card Fees | 2,897 | 0.3% | 0 | 0.0% |
| Telephone | 846 | 0.1% | 8,623 | 1.0% |
| Storage | 0 | 0.0% | 0 | 0.0% |
| Dues | 0 | 0.0% | 0 | 0.0% |
| Gifts | 0 | 0.0% | 0 | 0.0% |
| Employment Agency Fees | 0 | 0.0% | 0 | 0.0% |
| Business Promo | 0 | 0.0% | 0 | 0.0% |
| Licenses | 0 | 0.0% | 0 | 0.0% |
| Postage and Delivery | 663 | 0.1% | 0 | 0.0% |
| Printing | 36 | 0.0% | 0 | 0.0% |
| Accounting Fees | 2,558 | 0.3% | 0 | 0.0% |
| Staff Meeting | 0 | 0.0% | 0 | 0.0% |
| Utilities | 0 | 0.0% | 397 | 0.0% |
| Miscellaneous | 0 | 0.0% | 2,263 | 0.3% |
| Total Expenses | 103,690 | 12.0% | 224,923 | 26.1% |
| **NET PROFIT** | $10,918 | 1.3% | $31,276 | 3.6% |
| Locke's Interest in entity's profit   [2] | 50% | | 100% | |
| Recorded / Calculated Net Profit to Locke | $5,459 | | $31,276 | |
| Total Locke Net Profit - 2000 | $36,735 | | | |
| Add:  BL Metabolife Partnership Inc.   [3] | 2,086 | | | |
| TOTAL PROFIT TO LOCKE IN 2000 (Jan-Jul) | $38,821 | | | |
| Annualized 2000 Profit | $66,550 | | | |

**23**

BRINIG & COMPANY
INCORPORATED

SCHEDULE A-3b
Gregory R. Locke
Comparative Income Statements per Financial Statements - 1999
[Note 1]

| | [2.002-3]<br>Metabolife Ind. Dist.<br>Schedule C | | [2.004-8]<br>Star Metabolife<br>Form 1065 | | [2.080]<br>Raywen Ent., Inc.<br>Form 1120S | |
|---|---|---|---|---|---|---|
| **INCOME** | | | | | | |
| Gross Sales | $860,743 | 100.0% | $802,149 | 93.2% | $198,395 | 23.0% |
| Returns and Allowances | 0 | 0.0% | 1,922 | 0.2% | 0 | 0.0% |
| Net Sales | 860,743 | 100.0% | 800,227 | 93.0% | 198,395 | 23.0% |
| **COST OF GOODS SOLD** | | | | | | |
| Beginning Inventory | 1,737 | 0.2% | 12,729 | 1.5% | 0 | 0.0% |
| Purchases | 413,028 | 48.0% | 422,436 | 49.1% | 108,461 | 12.6% |
| Cost of Labor | 79,107 | 9.2% | 0 | 0.0% | 0 | 0.0% |
| Materials and Supplies | 2,174 | 0.3% | 0 | 0.0% | 0 | 0.0% |
| Other Costs | 5,070 | 0.6% | 0 | 0.0% | 0 | 0.0% |
| Ending Inventory | 0 | 0.0% | 12,218 | 1.4% | 0 | 0.0% |
| Total Cost of Goods Sold | 501,116 | 58.2% | 422,947 | 49.1% | 108,461 | 12.6% |
| **GROSS PROFIT** | 359,627 | 41.8% | 377,280 | 43.8% | 89,934 | 10.4% |
| **EXPENSES** | | | | | | |
| Advertising | 2,535 | 0.3% | 1,150 | 0.1% | 0 | 0.0% |
| Car and Truck Expenses | 14,113 | 1.6% | 0 | 0.0% | 263 | 0.0% |
| Insurance | 694 | 0.1% | 147 | 0.0% | 0 | 0.0% |
| Legal and Professional Services | 1,000 | 0.1% | 0 | 0.0% | 519 | 0.1% |
| Office Expense | 1,857 | 0.2% | 0 | 0.0% | 147 | 0.0% |
| Salaries and Wages | 0 | 0.0% | 91,693 | 10.7% | 39,363 | 4.6% |
| Vehicle, Machinery and Equipment Rent/Lease | 79,648 | 9.3% | 906 | 0.1% | 1,567 | 0.2% |
| Other Business Property Rent/Lease | 6,777 | 0.8% | 73,735 | 8.6% | 20,036 | 2.3% |
| Repairs and Maintenance | 169 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Supplies | 512 | 0.1% | 2,759 | 0.3% | 95 | 0.0% |
| Taxes and Licenses | 643 | 0.1% | 10,950 | 1.3% | 2,082 | 0.2% |
| Travel | 9,547 | 1.1% | 0 | 0.0% | 0 | 0.0% |
| Meals and Entertainment | 2,742 | 0.3% | 0 | 0.0% | 0 | 0.0% |
| Other Expenses | | | | | | |
| Bank Charges and Credit Card Fees | 5,591 | 0.6% | 9,254 | 1.1% | 0 | 0.0% |
| Telephone | 10,195 | 1.2% | 1,410 | 0.2% | 2,321 | 0.3% |
| Storage | 905 | 0.1% | 0 | 0.0% | 110 | 0.0% |
| Dues | 918 | 0.1% | 35 | 0.0% | 0 | 0.0% |
| Gifts | 150 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Employment Agency Fees | 4,736 | 0.6% | 0 | 0.0% | 0 | 0.0% |
| Business Promo | 0 | 0.0% | 476 | 0.1% | 0 | 0.0% |
| Licenses | 0 | 0.0% | 145 | 0.0% | 0 | 0.0% |
| Postage and Delivery | 0 | 0.0% | 1,611 | 0.2% | 0 | 0.0% |
| Printing | 0 | 0.0% | 258 | 0.0% | 0 | 0.0% |
| Accounting Fees | 0 | 0.0% | 2,621 | 0.3% | 0 | 0.0% |
| Staff Meeting | 0 | 0.0% | 85 | 0.0% | 0 | 0.0% |
| Miscellaneous | 0 | 0.0% | 0 | 0.0% | 201 | 0.0% |
| Total Expenses | 142,732 | 16.6% | 197,235 | 22.9% | 66,704 | 7.7% |
| **NET PROFIT** | $216,895 | 25.2% | $180,045 | 20.9% | $23,230 | 2.7% |
| Locke's Interest in entity's profit [2] | 100% | | 50% | | 100% | |
| Recorded / Calculated Net Profit to Locke | $216,895 | | $90,023 | | $23,230 | |

Total Locke Net Profit - 1999      $330,148
Add: BL Metabolife Partnership Inc. [E2.68] [3]      3,750

TOTAL PROFIT TO LOCKE IN 1999      $333,898

**24**



BRINIG & COMPANY
INCORPORATED

## NOTES TO SCHEDULE A-3a and A-3b

1.  These schedules present the historical financial data for the Locke business for 1999 and the seven months ended July 31, 2000.  The conclusion of this schedule is an estimate of the representative annual profit generated by Mr. Locke's Metabolife related businesses in 1999 and 2000.  For financial analysis purposes, adjustments have been made to the annual profit to reflect the estimated total annual profits earned by the plaintiff from Metabolife related activities.  The notes that follow explain the adjustments that were made to the annual net income.

2.  The majority of Mr. Locke's Metabolife business includes his sole proprietorship (100% interest) and a partnership referred to as "Star Metabolife" (50% interest).  Therefore, to calculate the annual profit to Mr. Locke, 100% of the sole proprietorship's net income and 50% of the Star Metabolife partnership's net income are combined.

3.  Mr. Locke also maintained a 50% interest in another partnership referred to as "BL Metabolife Partners."  His share of 1999 income from this partnership was $3,750.  His share of 2000 income (through July 31, 2000) was $2,086.  These amounts were included in calculating the total annual profit produced by Mr. Locke's various Metabolife related business interests.

### SCHEDULE B-1
## GOLDSTEIN, et al.  vs.  METABOLIFE INTERNATIONAL, INC., et al.
### ECONOMIC LOSS CALCULATIONS - GOLDSTEIN

General Information:

| | |
|---|---|
| Date of Valuation: | 04/30/2003 |
| Date of Premier Distributor Agreement:  [E1.2] | 08/04/1998 |
| Date Metabolife announces "retail" plan to distributors:  [E1.6] | 07/29/2000 |

## SUMMARY

| | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| Past Loss of Profits | $221,069 | $460,077 | $460,077 |
| Future Loss of Profits (PV) | --- | 19,883 | 108,616 |
| Total Economic Loss | $221,069 | $479,960 | $568,692 |

**26**

BRINIG & COMPANY
INCORPORATED

SCHEDULE B-2
# GOLDSTEIN, et al.  vs.  METABOLIFE INTERNATIONAL, INC., et al.
### ECONOMIC LOSS CALCULATIONS - GOLDSTEIN

General Information:

| | |
|---|---|
| Date of Valuation: | 04/30/2003 |
| Date of Premier Distributor Agreement:  [E1.2] | 08/04/1998 |
| Date Metabolife announces "retail" plan to distributors:  [E1.6] | 07/29/2000 |

**LOST PROFITS**                                                   **1, 3, 5 Years**

**Assumptions:**

| Rep. Annual Net Profits | | $201,441 |
|---|---|---|
| Growth Rates: | 2001 | 16.8% |
| | 2002 | -52.2% |
| | 2003+ | -25.3% |
| Discount Rate | | 33% |

| Period [1] | | | # Years | Adjusted Representative Annual Net Profits | Period Loss | Discount Rate | Present Value |
|---|---|---|---|---|---|---|---|
| **1 YEAR** | | | | | | | |
| 08/01/2000 | to | 12/31/2000 | 0.4 | $201,441 | $84,605 | | $84,605 |
| 01/01/2001 | to | 07/31/2001 | 0.6 | 235,283 | 136,464 | | 136,464 |
| | | | 1.0 | 1 Year Loss of Past Net Profits | | | $221,069 |
| | | | | | | | |
| **3 YEARS** | | | | | | | |
| 08/01/2001 | to | 12/31/2001 | 0.4 | $235,283 | $98,819 | | $98,819 |
| 01/01/2002 | to | 12/31/2002 | 1.0 | 112,465 | 112,465 | | 112,465 |
| 01/01/2003 | to | 04/30/2003 | 0.3 | 84,011 | 27,724 | | 27,724 |
| | | | | 2.7 Year Loss of Past Net Profits | | | $460,077 |
| | | | | | | | |
| 05/01/2003 | to | 07/31/2003 | 0.3 | $84,011 | $21,003 | 33% | $19,883 |
| | | | 3.0 | 0.3 Year Loss of Future Net Profits (PV) | | | $19,883 |
| | | | | | | | |
| | | | | 3 Year Total Loss of Net Profits (PV) | | | $479,960 |
| | | | | | | | |
| **5 YEARS** | | | | | | | |
| 08/01/2000 | to | 04/30/2003 | 2.7 | 2.7 Year Loss of Past Net Profits | | | $460,077 |
| | | | | | | | |
| 05/01/2003 | to | 12/31/2003 | 0.7 | $84,011 | $56,288 | 33% | $49,850 |
| 01/01/2004 | to | 12/31/2004 | 1.0 | 62,757 | 62,757 | 33% | 43,608 |
| 01/01/2005 | to | 07/31/2005 | 0.6 | 46,879 | 27,190 | 33% | 15,157 |
| | | | 5.0 | 2.3 Year Loss of Future Net Profits (PV) | | | $108,616 |
| | | | | | | | |
| | | | | 5 Year Total Loss of Net Profits (PV) | | | $568,692 |

[1]  From 8/1/00; date of breach of distributor agreement assumed to be 7/29/00.

**27**

BRINIG & COMPANY
INCORPORATED

SCHEDULE B-3

### Michael J. Goldstein - New Century Health Enterprises, Inc.
Comparative Income Statements per Tax Returns    [Note 1]

| | [3.037-46] 1998 | | [3 027-36] 1999 | | [3.06b] Jan-Jul 2000 | | [3.003-12] 2000 | |
|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | |
| Gross Sales | $450,494 | 100.2% | $1,821,491 | 100.0% | $678,454 | 106.3% | $768,411 | 100.0% |
| Returns and Allowances | 840 | 0.2% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Sales Tax | 0 | 0.0% | 0 | 0.0% | (40,099) | -6.3% | 0 | 0.0% |
| Net Sales | 449,654 | 100.0% | 1,821,491 | 100.0% | 638,355 | 100.0% | 768,411 | 100.0% |
| **COST OF GOODS SOLD** | | | | | | | | |
| Beginning Inventory | 0 | 0.0% | 31,593 | 1.7% | 0 | 0.0% | 24,721 | 3.2% |
| Purchases | 255,537 | 56.8% | 940,644 | 51.6% | 275,069 | 43.1% | 341,518 | 44.4% |
| Shipping | 0 | 0.0% | 0 | 0.0% | 1,436 | 0.2% | 0 | 0.0% |
| Ending Inventory | (31,593) | -7.0% | (24,721) | -1.4% | 0 | 0.0% | (1,216) | -0.2% |
| Total Cost of Goods Sold | 223,944 | 49.8% | 947,516 | 52.0% | 276,505 | 43.3% | 365,023 | 47.5% |
| **GROSS PROFIT** | 225,710 | 50.2% | 873,975 | 48.0% | 361,850 | 56.7% | 403,388 | 52.5% |
| **EXPENSES** | | | | | | | | |
| Compensation of Officers | 25,000 | 5.6% | 98,550 | 5.4% | 42,500 | 6.7% | 101,200 | 13.2% |
| Salaries and Wages | 49,978 | 11.1% | 300,849 | 16.5% | 78,583 | 12.3% | 133,700 | 17.4% |
| Repairs and Maintenance | 1,637 | 0.4% | 2,123 | 0.1% | 0 | 0.0% | 4,450 | 0.6% |
| Bad Debts | 0 | 0.0% | 2,745 | 0.2% | 0 | 0.0% | 1,341 | 0.2% |
| Rents | 59,872 | 13.3% | 217,253 | 11.9% | 67,640 | 10.6% | 83,880 | 10.9% |
| Taxes and Licenses | | | | | | | | |
| Payroll Tax | 5,948 | 1.3% | 62,173 | 3.4% | 41,180 | 6.5% | 24,701 | 3.2% |
| Other Taxes | 0 | 0.0% | 2,487 | 0.1% | 0 | 0.0% | 0 | 0.0% |
| Licenses | 164 | 0.0% | 591 | 0.0% | 163 | 0.0% | 163 | 0.0% |
| Advertising | 483 | 0.1% | 50,049 | 2.7% | 19,191 | 3.0% | 28,404 | 3.7% |
| Other Deductions | | | | | | | | |
| Credit Card Fees | 2,882 | 0.6% | 20,112 | 1.1% | 8,215 | 1.3% | 11,306 | 1.5% |
| Seminars | 0 | 0.0% | 0 | 0.0% | 399 | 0.1% | 399 | 0.1% |
| Gifts | 350 | 0.1% | 650 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Equipment Rental | 0 | 0.0% | 431 | 0.0% | 0 | 0.0% | 431 | 0.1% |
| Moving Expense | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 117 | 0.0% |
| Sign Rental | 0 | 0.0% | 0 | 0.0% | 1,352 | 0.2% | 4,106 | 0.5% |
| Accounting | 170 | 0.0% | 900 | 0.0% | 725 | 0.1% | 1,790 | 0.2% |
| Auto/Truck Expense | 787 | 0.2% | 3,368 | 0.2% | 1,146 | 0.2% | 1,511 | 0.2% |
| Bank Charges | 578 | 0.1% | 1,758 | 0.1% | 2,417 | 0.4% | 1,449 | 0.2% |
| Cash Shortage | 20 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Freight | 0 | 0.0% | 7,546 | 0.4% | 0 | 0.0% | 2,984 | 0.4% |
| Insurance | 270 | 0.1% | 4,651 | 0.3% | 1,671 | 0.3% | 0 | 0.0% |
| Janitor | 0 | 0.0% | 1,895 | 0.1% | 1,917 | 0.3% | 2,250 | 0.3% |
| Legal and Professional | 0 | 0.0% | 20,600 | 1.1% | 19,755 | 3.1% | 40,822 | 5.3% |
| Meals & Entertainment | 65 | 0.0% | 0 | 0.0% | 758 | 0.1% | 470 | 0.1% |
| Office Expense | 2,739 | 0.6% | 22,952 | 1.3% | 19,793 | 3.1% | 20,555 | 2.7% |
| Outside Services | 1,510 | 0.3% | 0 | 0.0% | 477 | 0.1% | 0 | 0.0% |
| Postage | 271 | 0.1% | 4,109 | 0.2% | 1,598 | 0.3% | 3,448 | 0.4% |
| Printing | 1,816 | 0.4% | 10,270 | 0.6% | 1,554 | 0.2% | 2,850 | 0.4% |
| Storage | 0 | 0.0% | 1,338 | 0.1% | 560 | 0.1% | 990 | 0.1% |
| Supplies | 905 | 0.2% | 0 | 0.0% | 1,410 | 0.2% | 0 | 0.0% |
| Telephone | 1,094 | 0.2% | 6,421 | 0.4% | 3,479 | 0.5% | 6,208 | 0.8% |
| Travel | 337 | 0.1% | 15,057 | 0.8% | 523 | 0.1% | 2,009 | 0.3% |
| Utilities | 0 | 0.0% | 1,684 | 0.1% | 1,266 | 0.2% | 2,054 | 0.3% |
| Total Expenses | 156,876 | 34.9% | 860,562 | 47.2% | 318,272 | 49.9% | 483,588 | 62.9% |
| **NET INCOME** | $68,834 | 15.3% | $13,413 | 0.7% | $43,578 | 6.8% | ($80,200) | -10.4% |
| **ADJUSTMENTS** | | | | | | | | |
| Officer Compensation | | [2] | 98,550 | | 42,500 | | | |
| Excess Salary - Boury | | [3] | 46,689 | | - | | | |
| Excess Salary - Johnson | | [3] | 40,961 | | - | | | |
| Office Expense | | [4] | 15,714 | | 12,679 | | | |
| Travel | | [5] | 12,963 | | - | | | |
| Legal & Professional | | [6] | 20,600 | | 18,750 | | | |
| Mississippi Loss | | [7] | 10,420 | | - | | | |
| ADJUSTED NET INCOME / PROFIT TO GOLDSTEIN | | | $259,310 | | $117,507 | | | |
| ANNUALIZED NET INCOME / PROFIT | | | | | $201,441 | | | |

**BRINIG & COMPANY**
INCORPORATED

## NOTES TO SCHEDULE B-3

1. This schedule presents the historical financial data for the Goldstein business. The source of the financial data is the U. S. Income Tax Return for an S Corporation (Form 1120S) for the years 1998, 1999 and 2000. The financial data presented for the seven months ended July 31, 2000 was derived from the corporation's internal financial records.

   The conclusion of this schedule is an estimate of the representative annual profit generated by Mr. Goldstein's Metabolife related business in 1999 and 2000. For financial analysis purposes, adjustments have been made to the annual profit to reflect the estimated total annual profits earned by the plaintiff from Metabolife related activities. The notes that follow explain the adjustments that were made to the annual net income.

2. Officer Compensation paid to Mr. Goldstein is added back as an adjustment to calculate the total profit earned by the business and payable to Mr. Goldstein.

3. Mr. Goldstein employed two highly compensated managers to assist him in growing his business based on the perceived opportunity presented by Metabolife products and Metabolife's stated commitment to advertising in his area. In the situation where the growth opportunities and Metabolife's commitment did not materialize, Mr. Goldstein would not have hired top level managers to operate his businesses. Instead, he would have hired personnel necessary to run the day to day operations at a lower rate of pay. The indicated "Excess Salary" adjustments is the amount of excess compensation paid by the business in excess of the estimated fair compensation and benefits for the appropriate management personnel.

   The excess compensation paid to his manager was not considered material for the seven months ended July 31, 2000.

4. The indicated adjustment for Office Expense represents amounts that were expensed by the business for leasehold improvements. This expenditure should have been capitalized and not expensed.

5. The amount indicated for Travel Expense is above the amount required for the normal operations of the business.

6. Legal and Professional expense of $20,600 represent consulting fees paid to a related entity (Survival Services) and is not an actual business expense. Therefore, this expense is added back to net income.

7. "Mississippi Loss" represents the loss incurred by Mr. Goldstein in opening a business in Mississippi based on certain representations by Metabolife for supporting advertising in that area. The advertising did not occur. Therefore, had Mr. Goldstein known that he would not receive the promised support by Metabolife, he would not have opened this business and incurred this loss.



BRINIG & COMPANY
INCORPORATED

**SCHEDULE C-1**

## GOLDSTEIN, et al.  vs.  METABOLIFE INTERNATIONAL, INC., et al.
### ECONOMIC LOSS CALCULATIONS - COUGHLIN

General Information:

| | |
|---|---|
| Date of Valuation: | 04/30/2003 |
| Date of Premier Distributor Agreement: [E1.3] | May 1998 |
| Date Metabolife announces "retail" plan to distributors: [E1.6] | 07/29/2000 |

## SUMMARY

| | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| Past Loss of Profits | $206,102 | $428,929 | $428,929 |
| Future Loss of Profits (PV) | --- | 18,537 | 101,262 |
| Total Economic Loss | $206,102 | $447,466 | $530,191 |

**30**

BRINIG & COMPANY
INCORPORATED

SCHEDULE C-2

# GOLDSTEIN, et al.  vs.  METABOLIFE INTERNATIONAL, INC., et al.
## ECONOMIC LOSS CALCULATIONS - COUGHLIN

General Information:

| | |
|---|---|
| Date of Valuation: | 04/30/2003 |
| Date of Premier Distributor Agreement: [E1.3] | May 1998 |
| Date Metabolife announces "retail" plan to distributors: [E1.6] | 07/29/2000 |

**LOST PROFITS**                                                    **1, 3, 5 Years**

**Assumptions:**

| | | | | | |
|---|---|---|---|---|---|
| Rep. Annual Net Profits | | $187,803 | | | |
| Growth Rates: | 2001 | 16.8% | | | |
| | 2002 | -52.2% | | | |
| | 2003+ | -25.3% | | | |
| Discount Rate | | 33% | | | |

| | Period [1] | | # Years | Adjusted Representative Annual Net Profits | Period Loss | Discount Rate | Present Value |
|---|---|---|---|---|---|---|---|
| **1 YEAR** | | | | | | | |
| 08/01/2000 | to | 12/31/2000 | 0.4 | $187,803 | $78,877 | | $78,877 |
| 01/01/2001 | to | 07/31/2001 | 0.6 | 219,354 | 127,225 | | 127,225 |
| | | | 1.0 | 1 Year Loss of Past Net Profits | | | $206,102 |
| | | | | | | | |
| **3 YEARS** | | | | | | | |
| 08/01/2001 | to | 12/31/2001 | 0.4 | $219,354 | $92,129 | | $92,129 |
| 01/01/2002 | to | 12/31/2002 | 1.0 | 104,851 | 104,851 | | 104,851 |
| 01/01/2003 | to | 04/30/2003 | 0.3 | 78,324 | 25,847 | | 25,847 |
| | | | | 2.7 Year Loss of Past Net Profits | | | $428,929 |
| | | | | | | | |
| 05/01/2003 | to | 07/31/2003 | 0.3 | $78,324 | $19,581 | 33% | $18,537 |
| | | | 3.0 | 0.3 Year Loss of Future Net Profits (PV) | | | $18,537 |
| | | | | | | | |
| | | | | 3 Year Total Loss of Net Profits (PV) | | | $447,466 |
| | | | | | | | |
| **5 YEARS** | | | | | | | |
| 08/01/2000 | to | 04/30/2003 | 2.7 | 2.7 Year Loss of Past Net Profits | | | $428,929 |
| | | | | | | | |
| 05/01/2003 | to | 12/31/2003 | 0.7 | $78,324 | $52,477 | 33% | $46,475 |
| 01/01/2004 | to | 12/31/2004 | 1.0 | 58,508 | 58,508 | 33% | 40,655 |
| 01/01/2005 | to | 07/31/2005 | 0.6 | 43,705 | 25,349 | 33% | 14,131 |
| | | | 5.0 | 2.3 Year Loss of Future Net Profits (PV) | | | $101,262 |
| | | | | | | | |
| | | | | 5 Year Total Loss of Net Profits (PV) | | | $530,191 |

[1] From 8/1/00; date of breach of distributor agreement assumed to be 7/29/00.



**31**

BRINIG & COMPANY
INCORPORATED

SCHEDULE C-3a
## Mark J. Coughlin - 2000
### Comparative Income Statements per Schedule C's - 2000

[Note 1]

| | [4.010-11] Galleria Mall | | [4.016-17] Delaware Ave. | | [4.014-15] Sangertown Sq. Mall | | Total | |
|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | |
| Gross Sales | $256,932 | 104.9% | $23,200 | 103.7% | $2,855 | 105.0% | $282,987 | 104.8% |
| Returns and Allowances | 12,088 | 4.9% | 830 | 3.7% | 135 | 5.0% | 13,053 | 4.8% |
| Net Sales | 244,844 | 100.0% | 22,370 | 100.0% | 2,720 | 100.0% | 269,934 | 100.0% |
| **COST OF GOODS SOLD** | | | | | | | | |
| Beginning Inventory | 4,632 | 1.9% | 0 | 0.0% | 2,285 | 84.0% | 6,917 | 2.3% |
| Purchases | 74,924 | 30.6% | 11,367 | 50.8% | 0 | 0.0% | 86,291 | 33.4% |
| Cost of Labor | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Ending Inventory | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Total Cost of Goods Sold | 79,556 | 32.5% | 11,367 | 50.8% | 2,285 | 84.0% | 93,208 | 35.7% |
| **GROSS PROFIT** | 165,288 | 67.5% | 11,003 | 49.2% | 435 | 16.0% | 176,726 | 64.3% |
| **EXPENSES** | | | | | | | | |
| Advertising | 294 | 0.1% | 836 | 3.7% | 0 | 0.0% | 1,130 | 0.4% |
| Car and Truck Expenses | 8,645 | 3.5% | 0 | 0.0% | 0 | 0.0% | 8,645 | 2.9% |
| Insurance | 504 | 0.2% | 0 | 0.0% | 0 | 0.0% | 504 | 0.2% |
| Legal and Professional | 250 | 0.1% | 0 | 0.0% | 0 | 0.0% | 250 | 0.1% |
| Office Expense | 2,563 | 1.0% | 1,978 | 8.8% | 0 | 0.0% | 4,541 | 1.6% |
| Other Business Property, Rent | 30,000 | 12.3% | 1,575 | 7.0% | 3,500 | 128.7% | 35,075 | 12.6% |
| Supplies | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Travel | 2,584 | 1.1% | 0 | 0.0% | 0 | 0.0% | 2,584 | 0.9% |
| Meals and Entertainment | 415 | 0.2% | 68 | 0.3% | 0 | 0.0% | 483 | 0.2% |
| Utilities | 4,480 | 1.8% | 1,148 | 5.1% | 69 | 2.5% | 5,697 | 2.0% |
| Other Expenses | | | | | | | | |
| Cell Phone | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| NSF Checks-Loss | 45 | 0.0% | 36 | 0.2% | 0 | 0.0% | 81 | 0.0% |
| Shipping Costs | 572 | 0.2% | 0 | 0.0% | 0 | 0.0% | 572 | 0.2% |
| Bank Charges | 249 | 0.1% | 0 | 0.0% | 15 | 0.6% | 264 | 0.1% |
| Dues & Donations | 229 | 0.1% | 0 | 0.0% | 0 | 0.0% | 229 | 0.1% |
| Toll Fees | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Credit Card Fees | 4,044 | 1.7% | 261 | 1.2% | 91 | 3.3% | 4,396 | 1.6% |
| Distributor Fees | 38,594 | 15.8% | 0 | 0.0% | 0 | 0.0% | 38,594 | 13.1% |
| Gifts | 42 | 0.0% | 0 | 0.0% | 0 | 0.0% | 42 | 0.0% |
| Postage and Delivery | 0 | 0.0% | 15 | 0.0% | 19 | 0.0% | 34 | 0.0% |
| Total Expenses | 93,510 | 38.2% | 5,917 | 26.5% | 3,694 | 135.8% | 103,121 | 35.9% |
| **NET INCOME** | $71,778 | 29.3% | $5,086 | 22.7% | ($3,259) | -119.8% | $83,841 | 28.4% |

### Summary Data for 7 months ended July 31, 2000

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sales | 217,125 | | 17,164 | | 1,520 | | 235,809 | |
| Net Income | 94,835 | | 7,008 | | (2,472) | | 99,371 | |

| | | | | |
|---|---|---|---|---|
| Net Income | | | $99,371 | |
| Adjustments | | | | |
| Sangertown Square loss | | [2] | 2,472 | |
| Commission Income (1-7/00) | [4.64] | [3] | 3,490 | |
| Schedule E Income | [4.58] | [4] | 4,219 | |
| Adjusted Net Income (1-7/00) | | | $109,552 | |
| Annualized 2000 Net Income/Profit | | | $187,803 | |

**32**

**BRINIG & COMPANY**
INCORPORATED

**SCHEDULE C-3b**
Mark J. Coughlin - 1999
Comparative Income Statements per Schedule C's - 1999

[Note 1, 2]

| | [4.004-5] Galleria Mall | | [4.006-7] Pyramid Mall | | [4.008-9] Sangertown Square Mall | | Total | |
|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | |
| Gross Sales | $686,378 | 105.1% | $7,075 | 106.6% | $24,084 | 108.2% | $717,537 | 105.2% |
| Returns and Allowances | 33,108 | 5.1% | 440 | 6.6% | 1,815 | 8.2% | 35,363 | 5.2% |
| Net Sales | 653,270 | 100.0% | 6,635 | 100.0% | 22,269 | 100.0% | 682,174 | 100.0% |
| **COST OF GOODS SOLD** | | | | | | | | |
| Beginning Inventory | 4,485 | 0.7% | 0 | 0.0% | 0 | 0.0% | 4,485 | 0.7% |
| Purchases | 379,789 | 58.1% | 8,016 | 120.8% | 13,972 | 62.7% | 401,777 | 58.9% |
| Cost of Labor | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Ending Inventory | (4,632) | -0.7% | 0 | 0.0% | (2,285) | -10.3% | (6,917) | -1.0% |
| Total Cost of Goods Sold | 379,642 | 58.1% | 8,016 | 120.8% | 11,687 | 52.5% | 399,345 | 58.5% |
| **GROSS PROFIT** | 273,628 | 41.9% | (1,381) | -20.8% | 10,582 | 47.5% | 282,829 | 41.5% |
| **EXPENSES** | | | | | | | | |
| Advertising | 601 | 0.1% | 626 | 9.4% | 115 | 0.5% | 1342 | 0.2% |
| Car and Truck Expenses | 10,519 | 1.6% | 0 | 0.0% | 0 | 0.0% | 10,519 | 1.5% |
| Insurance | 350 | 0.1% | 0 | 0.0% | 0 | 0.0% | 350 | 0.1% |
| Legal and Professional | 165 | 0.0% | 0 | 0.0% | 0 | 0.0% | 165 | 0.0% |
| Office Expense | 8,867 | 1.4% | 1,612 | 24.3% | 2,047 | 9.2% | 12,526 | 1.8% |
| Other Business Property, Rent | 36,907 | 5.6% | 10,000 | 150.7% | 15,000 | 67.4% | 61,907 | 9.1% |
| Supplies | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Travel | 3,609 | 0.6% | 2,441 | 36.8% | 1,627 | 7.3% | 7,677 | 1.1% |
| Meals and Entertainment | 230 | 0.0% | 0 | 0.0% | 0 | 0.0% | 230 | 0.0% |
| Utilities | 4,868 | 0.7% | 303 | 4.6% | 427 | 1.9% | 5,598 | 0.8% |
| Other Expenses | | | | | | | 0 | |
| Cell Phone | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| NSF Checks-Loss | 335 | 0.1% | 0 | 0.0% | 0 | 0.0% | 335 | 0.0% |
| Shipping Costs | 1,651 | 0.3% | 0 | 0.0% | 0 | 0.0% | 1,651 | 0.2% |
| Bank Charges | 233 | 0.0% | 77 | 1.2% | 58 | 0.3% | 368 | 0.1% |
| Dues & Donations | 55 | 0.0% | 0 | 0.0% | 0 | 0.0% | 55 | 0.0% |
| Toll Fees | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Credit Card Fees | 7,786 | 1.2% | 132 | 2.0% | 318 | 1.4% | 8,236 | 1.2% |
| Distributor Fees | 26,122 | 4.0% | 3,875 | 58.4% | 11,897 | 53.4% | 41,894 | 6.1% |
| Gifts | 100 | 0.0% | 120 | 1.8% | 50 | 0.2% | 270 | 0.0% |
| Postage and Delivery | 0 | 0.0% | 0 | 0.0% | 396 | 1.8% | 396 | 0.1% |
| Total Expenses | 102,398 | 15.7% | 19,186 | 289.2% | 31,935 | 143.4% | 153,519 | 22.5% |
| **NET INCOME** | $171,230 | 26.2% | ($20,567) | -310.0% | ($21,353) | -95.9% | $129,310 | 19.0% |
| **Adjustments** | | | | | | | | |
| Commission Income [4.68] | 10,870 | | | | | | | |
| Schedule E Income [4.68] | 30,123 | | | | | | | |
| **Adjusted N.I.** | $212,223 | | | | | | | |



**BRINIG & COMPANY**
INCORPORATED

33

## NOTES TO SCHEDULE C-3a and C-3b

1.  This schedule presents the historical financial data for the Coughlin business. The conclusion of this schedule is an estimate of the representative annual profit generated by Mr. Coughlin's Metabolife related business in 1999 and 2000. For financial analysis purposes, adjustments have been made to the annual profit to reflect the estimated total annual profits earned by the plaintiff from Metabolife related activities. The notes that follow explain the adjustments that were made to the annual net income recorded.

2.  The losses from the Pyramid Mall and Sangertown Square Mall locations were not included in estimating Mr. Coughlin's representative annual profit for 1999. These two locations were opened in 1999 in large part based upon promises of local advertising to be provided Metabolife. The advertising was not delivered. Therefore, had Mr. Coughlin known that he would not receive the promised support by Metabolife, he would not have opened these new locations and incurred these losses.

3.  Mr. Coughlin received commission income from Metabolife as the result of the "downline" distributor network he developed. The amount indicated represents commissions paid to him by Metabolife in 1999 and in the seven months ended July 31, 2000.

4.  Schedule E income resulted from Mr. Coughlin providing consulting services to a relative's Metabolife business. The amount indicated represents monies paid to him in 1999 and in the seven months ended July 31, 2000.



**34**

BRINIG & COMPANY
INCORPORATED


**SCHEDULE D-1**

## GOLDSTEIN, et al.  vs.  METABOLIFE INTERNATIONAL, INC., et al.
### ECONOMIC LOSS CALCULATIONS - BROWN

<u>General Information:</u>

| | |
|---|---|
| Date of Valuation: | 04/30/2003 |
| Date of Premier Distributor Agreement:  [E1.2] | 02/16/1998 |
| Date Metabolife announces "retail" plan to distributors:  [E1.6] | 07/29/2000 |

## SUMMARY

| | 1 Year | 3 Years | 5 Years |
|---|---|---|---|
| Past Loss of Profits | $268,860 | $559,538 | $559,538 |
| Future Loss of Profits (PV) | --- | 24,181 | 132,096 |
| Total Economic Loss | $268,860 | $583,719 | $691,634 |

**35**

BRINIG & COMPANY
INCORPORATED

**SCHEDULE D-2**

## GOLDSTEIN, et al.  vs.  METABOLIFE INTERNATIONAL, INC., et al.
### ECONOMIC LOSS CALCULATIONS - BROWN

General Information:

| | |
|---|---|
| Date of Valuation: | 04/30/2003 |
| Date of Premier Distributor Agreement:  [E1.2] | 02/16/1998 |
| Date Metabolife announces "retail" plan to distributors:  [E1.6] | 07/29/2000 |

**LOST PROFITS**                                                      **1, 3, 5 Years**

**Assumptions:**

| Rep. Annual Net Profits | | $244,989 |
|---|---|---|
| Growth Rates: | 2001 | 16.8% |
| | 2002 | -52.2% |
| | 2003+ | -25.3% |
| Discount Rate | | 33% |

| | Period [1] | | # Years | Adjusted Representative Annual Net Profits | Period Loss | Discount Rate | Present Value |
|---|---|---|---|---|---|---|---|
| **1 YEAR** | | | | | | | |
| 08/01/2000 | to | 12/31/2000 | 0.4 | $244,989 | $102,895 | | $102,895 |
| 01/01/2001 | to | 07/31/2001 | 0.6 | 286,147 | 165,965 | | 165,965 |
| | | | 1.0 | 1 Year Loss of Past Net Profits | | | $268,860 |
| | | | | | | | |
| **3 YEARS** | | | | | | | |
| 08/01/2001 | to | 12/31/2001 | 0.4 | $286,147 | $120,182 | | $120,182 |
| 01/01/2002 | to | 12/31/2002 | 1.0 | 136,778 | 136,778 | | 136,778 |
| 01/01/2003 | to | 04/30/2003 | 0.3 | 102,173 | 33,717 | | 33,717 |
| | | | | 2.7 Year Loss of Past Net Profits | | | $559,538 |
| | | | | | | | |
| 05/01/2003 | to | 07/31/2003 | 0.3 | $102,173 | $25,543 | 33% | $24,181 |
| | | | 3.0 | 0.3 Year Loss of Future Net Profits (PV) | | | $24,181 |
| | | | | | | | |
| | | | | 3 Year Total Loss of Net Profits (PV) | | | $583,719 |
| | | | | | | | |
| **5 YEARS** | | | | | | | |
| 08/01/2000 | to | 04/30/2003 | 2.7 | 2.7 Year Loss of Past Net Profits | | | $559,538 |
| | | | | | | | |
| 05/01/2003 | to | 12/31/2003 | 0.7 | $102,173 | $68,456 | 33% | $60,627 |
| 01/01/2004 | to | 12/31/2004 | 1.0 | 76,323 | 76,323 | 33% | 53,035 |
| 01/01/2005 | to | 07/31/2005 | 0.6 | 57,014 | 33,068 | 33% | 18,434 |
| | | | 5.0 | 2.3 Year Loss of Future Net Profits (PV) | | | $132,096 |
| | | | | | | | |
| | | | | 5 Year Total Loss of Net Profits (PV) | | | $691,634 |

[1]  From 8/1/00; date of breach of distributor agreement assumed to be 7/29/00.

**36**

BRINIG & COMPANY
INCORPORATED

**SCHEDULE 5**
**Donald T. Brown**
**Comparative Income Statements per Schedule C & Internal F/S**

[Note 1]

| | [5.006-7] 1999 | | | [C4.2] Jan. - Jul 2000 | |
|---|---|---|---|---|---|
| **INCOME** | | | | | |
| Gross Sales | $1,339,473 | 104.7% | Gross Sales by Location | | |
| Returns and Allowances | 60,392 | 4.7% | | | |
| | | | DBE | $44,233 | 5.81% |
| Net Sales | 1,279,081 | 100.0% | Berkshire Mall | 0 | 0.00% |
| | | | Bonita Lakes (50%) | 32,087 | 4.22% |
| COST OF GOODS SOLD | 673,742 | 52.7% | Columbia Mall (50%) | 69,740 | 9.16% |
| | | | Mall at Cortana | 168,449 | 22.13% |
| GROSS PROFIT | 605,339 | 47.3% | Eastern Hills Mall | 112,884 | 14.83% |
| | | | Hampshire Mall | 2,544 | 0.33% |
| Other Income | 0 | 0.0% | Holyoke Mall | 93,691 | 12.31% |
| | | | Inlet Square Mall (50%) | 9,477 | 1.25% |
| GROSS INCOME | 605,339 | 47.3% | Palisades Ctr Mall | 32,014 | 4.21% |
| | | | Parks at Arlington | 155,634 | 20.45% |
| EXPENSES | | | Sunrise Square | 40,364 | 5.30% |
| Advertising | 9,670 | 0.8% | | | |
| Car and Truck Expenses | 4,708 | 0.4% | Total | $761,114 | 100.00% |
| Depreciation | 17,230 | 1.4% | | | |
| Insurance | 8485 | 0.7% | Net Income by Location | | |
| Other Interest | 869 | 0.1% | | | |
| Legal and Professional   Services | 5692 | 0.5% | DBE | 37,115 | 4.88% |
| Office Expense | 16,025 | 1.3% | Berkshire Mall | 0 | 0.00% |
| Other Business Property   Rent or Lease | 183,577 | 14.4% | Bonita Lakes (50%) | (3,319) | -0.44% |
| Repairs and Maintenance | 2484 | 0.2% | Columbia Mall (50%) | 6,210 | 0.82% |
| Taxes and Licenses | 30,529 | 2.4% | Mall at Cortana | 25,025 | 3.29% |
| Travel | 13,824 | 1.1% | Eastern Hills Mall | 16,128 | 2.12% |
| Meals and Entertainment | 2,052 | 0.2% | Hampshire Mall | (5,876) | -0.77% |
| Utilities | 517 | 0.0% | Holyoke Mall | 2,991 | 0.39% |
| Wages | 171275 | 13.4% | Inlet Square Mall (50%) | (805) | -0.11% |
| Other Expenses | 38,118 | 3.0% | Palisades Ctr Mall | (14,733) | -1.94% |
| | | | Parks at Arlington | 26,713 | 3.51% |
| Total Expenses | 505,055 | 39.5% | Sunrise Square | (34,855) | -4.58% |
| | | | | | |
| NET INCOME | $100,284 | 7.8% | | $54,593 | 7.17% |
| | | | | | |
| ADJUSTMENTS | | | | | |
| Metabolife 1099 Income  [5.004]   [2] | 168,715 | | [2] | 50,577 | |
| Schedule E Income  [5.007]   [3] | 33,620 | | | | |
| Berkshire Mall (1999 loss)  [5.023]   [4] | 28,270 | | | 0 | |
| Hampshire Mall (1999 loss)  [5.055]   [4] | 18,210 | | | 5,876 | |
| Holyoke Mall (1999 loss)  [5.057]   [4] | 32,434 | | | (2,991) | |
| Sunrise Square Mall (1999 loss)  [5.082]   [4] | 18,619 | | | 34,855 | |
| | | | | | |
| ADJUSTED N.I. / PROFIT TO BROWN | $400,152 | | | $142,910 | |
| | | | | | |
| Annualized 2000 N.I. / Profit | | | | $244,989 | |



**BRINIG & COMPANY**
**INCORPORATED**

## NOTES TO SCHEDULE D-3

1. This schedule presents the historical financial data for the Brown business.  The conclusion of this schedule is an estimate of the representative annual profit generated by Mr. Brown's Metabolife related business in 1999 and 2000.  For financial analysis purposes, adjustments have been made to the annual profit to reflect the estimated total annual profits earned by the plaintiff from Metabolife related activities.  The notes that follow explain the adjustments that were made to the annual net income recorded in 1999 and in the seven months ended July 31, 2000.

2. Mr. Brown received significant commission income from Metabolife as the result of the "downline" distributor network he developed.  The amount indicated represents commissions paid to him by Metabolife in 1999 and in the seven months ended July 31, 2000.

3. Mr. Brown also maintained a interests in two partnerships referred to as "BL Metabolife Partners" and "BC Metabolife Partners."  His share of 1999 total partnership income from these partnership interests was $33,620.  This amount was included in calculating the total annual profit produced by Mr. Brown's various Metabolife related business interests.

4. Berkshire Mall, Hampshire Mall, Holyoke Mall and Sunrise Square Mall were locations opened by Mr. Brown based on certain representations by Metabolife for supporting advertising in that area.  The advertising did not occur and Mr. Brown experienced significant losses in those locations in 1999 and 2000.  Therefore, had Mr. Brown known that he would not receive the promised support by Metabolife, he would not have opened this business and incurred these losses.  The losses are added back to net income to calculate the adjusted net income / profit to Brown in 1999 and 2000.



BRINIG & COMPANY
INCORPORATED

**METABOLIFE INTERNATIONAL, INC.**
**INCOME STATEMENT**
Year Ended December 31

| | [14.6/14.21/14.22] 1999 | | [14.46] 2000 | | [14.46] 2001 * | |
|---|---|---|---|---|---|---|
| REVENUES | $350,540,040 | 100.0% | $221,473,642 | 100.0% | $258,614,912 | 100.0% |
| **COST OF SALES** | | | | | | |
| Royalties | 62,782,392 | 17.9% | | 0.0% | | 0.0% |
| Product costs | 55,122,688 | 15.7% | | 0.0% | | 0.0% |
| Merchant credit card fees | 6,640,631 | 1.9% | | 0.0% | | 0.0% |
| Scrap expense | 906,667 | 0.3% | | 0.0% | | 0.0% |
| TOTAL COST OF SALES | 125,452,378 | 35.8% | 51,922,590 | 23.4% | 100,143,892 | 38.7% |
| GROSS PROFIT MARGIN | 225,087,662 | 64.2% | 169,551,052 | 76.6% | 158,471,020 | 61.3% |
| **COSTS AND EXPENSES** | | | | | | |
| Advertising | 79,762,544 | 22.8% | | 0.0% | | 0.0% |
| Commissions | 77,807,565 | 22.2% | | 0.0% | | 0.0% |
| Salaries and wages | 15,536,551 | 4.4% | | 0.0% | | 0.0% |
| Professional services | 8,970,246 | 2.6% | | 0.0% | | 0.0% |
| Consulting | 3,482,685 | 1.0% | | 0.0% | | 0.0% |
| Contributions | 2,881,601 | 0.8% | D | 0.0% | D | 0.0% |
| Depreciation | 1,658,843 | 0.5% | E | 0.0% | E | 0.0% |
| Employee benefits | 1,227,352 | 0.4% | T | 0.0% | T | 0.0% |
| Rent | 1,202,829 | 0.3% | A | 0.0% | A | 0.0% |
| Telephone | 1,186,483 | 0.3% | I | 0.0% | I | 0.0% |
| Temporary services | 1,078,739 | 0.3% | L | 0.0% | L | 0.0% |
| Payroll taxes | 1,020,041 | 0.3% | | 0.0% | | 0.0% |
| Travel | 909,397 | 0.3% | N | 0.0% | N | 0.0% |
| Supplies | 888,027 | 0.3% | O | 0.0% | O | 0.0% |
| Insurance | 468,861 | 0.1% | T | 0.0% | T | 0.0% |
| Postage and delivery | 393,909 | 0.1% | | 0.0% | | 0.0% |
| Recruiting | 375,051 | 0.1% | P | 0.0% | P | 0.0% |
| Repairs and maintenance | 305,307 | 0.1% | R | 0.0% | R | 0.0% |
| Amortization | 298,826 | 0.1% | O | 0.0% | O | 0.0% |
| Printing | 221,258 | 0.1% | V | 0.0% | V | 0.0% |
| Conferences | 176,267 | 0.1% | I | 0.0% | I | 0.0% |
| Employee relocation | 169,630 | 0.0% | D | 0.0% | D | 0.0% |
| Utilities | 169,296 | 0.0% | E | 0.0% | E | 0.0% |
| 401(k) contributions | 130,610 | 0.0% | D | 0.0% | D | 0.0% |
| Meals and entertainment | 66,481 | 0.0% | | 0.0% | | 0.0% |
| Dues and subscriptions | 59,448 | 0.0% | | 0.0% | | 0.0% |
| Bad debt expense | 37,452 | 0.0% | | 0.0% | | 0.0% |
| Miscellaneous expense | 313,460 | 0.1% | | 0.0% | | 0.0% |
| TOTAL COST AND EXPENSES | 200,798,759 | 57.3% | 136,138,861 | 61.5% | 138,785,775 | 53.7% |
| OPERATING INCOME | $24,288,903 | 6.9% | $33,412,191 | 15.1% | $19,685,245 | 7.6% |
| **OTHER INCOME (EXPENSE)** | | | | | | |
| Interest Income | 416,200 | 0.1% | 391,937 | 0.2% | 269,281 | 0.1% |
| Interest Expense | (17,673) | -0.0% | (187,819) | -0.1% | (294,700) | -0.1% |
| Litigation settlements (Note 6) | | 0.0% | (8,250,000) | -3.7% | 0 | 0.0% |
| Loss on disposal of Leaseholds | | 0.0% | (1,545,238) | -0.7% | 0 | 0.0% |
| Total Other Income (expense) | 398,527 | 0.1% | (9,591,120) | -4.3% | (25,419) | -0.0% |
| INCOME BEFORE PROVISION FOR TAXES | 24,687,430 | 7.0% | 23,821,071 | 10.8% | 19,659,826 | 7.6% |
| BENEFIT/PROVISION FOR INCOME TAXES | 124,467 | 0.0% | (602,366) | -0.3% | (420,241) | -0.2% |
| NET INCOME | $24,811,897 | 7.1% | $23,218,705 | 10.5% | $19,239,585 | 7.4% |

\* Earnings restated.



BRINIG & COMPANY
INCORPORATED

## BRINIG & COMPANY
INCORPORATED

VALUATION AND FINANCIAL CONSULTANTS

101 WEST BROADWAY, SUITE 1650

SAN DIEGO, CALIFORNIA  92101-8290

TEL. (619) 687-2600   FAX (619) 544-0304

www.brinigco.com

### BRIAN P. BRINIG, JD, CPA, ASA

#### Résumé - January, 2003

## QUALIFICATIONS

Certified Public Accountant, California, 1977; Accredited in Business Valuation (ABV)
Attorney at Law (not practicing), California, 1979
Past President, Financial Analysts Society of San Diego
Accredited Senior Member (ASA) of American Society of Appraisers,
      Business Enterprise Valuation (Past Officer of National Business Valuation Committee)
Adjunct Professor, University of San Diego School of Law, Finance & Accounting
American Arbitration Association - Commercial Arbitrator
California Real Estate Broker, 1981-1985
Member, Litigation Services Committee, California Society of Certified Public Accountants,
      (Past Chair - San Diego Chapter; Past California Chair - Business Valuation Section)
Board of Directors, San Diego Society of CPAs (1992-1994)
Conference Chair, California Society of CPAs, 1992 Litigation Services Conference
Conference Co-Chair, Joint A.S.A. and Canadian Institute of Chartered Business Valuators,
      International Business Valuation Conference in San Diego, 1994
Member, Subcommittee for establishing Superior Court Family Law Rules relating to the
      appraisal of closely held business interests, San Diego County Bar Association, 1994-1995
Special Master of the Superior Court (Corporations Code §2000, business valuation, community property
      tracing and allocation matters)

## AREAS OF SPECIALTY

Business and professional practice valuation for purposes of purchase and sale, estate planning, condemnation and business litigation.  Merger and acquisition consulting to acquirers, targets and the professional community regarding valuation, financing and transaction structuring.  Financial analysis to determine economic damages from unjust enrichment, lost profits, diminution in value, business torts, or other causes of action.  Emphasis on forensic accounting, economics and complex litigation-related analysis.  Arbitrator and mediator for complex accounting and financial issues.

## EDUCATION

University of San Diego School of Law, JD, 1979
Georgetown University School of Business Administration, BSBA (Accounting), 1973

## EXPERIENCE

Price Waterhouse & Co., Atlanta, Georgia, 1973-1975
Arthur Young and Company, San Diego, California, 1975-1976
Vice President, Regional Business Brokerage Firm, 1979-1980
Partner, Business Appraisal and Brokerage Firm, 1980-1983
Principal, Brinig & Company, Inc., 1983 to present
National University, Adj. Professor of Accounting, 1980-1983
University of San Diego School of Law, Adj. Professor, Finance & Accounting, 1997 to present



Resumé: Brian P. Brinig

## BOOKS

Brinig, B. P. and Gladson, E., *Developing and Managing a Litigation Services Practice*, (New York: Harcourt Professional Publishing, 2000).

Brinig, B. P. (co-authored with Carmichael, D. R. and Ladouceur, R. P., *et al.*), *Guide to Litigation Support Services*, (Fort Worth, TX: Practitioners Publishing Company, 1999).

Brinig, B. P., chapter author: The Art of Testifying, *Litigation Services Handbook*, Weil, Frank & Wagner, editors, (New York: John Wiley & Sons, 1995), pp. 8.1 to 8.9.

## PUBLICATIONS AND LECTURES

Brinig, B.P., interview, *Goodwill under Financial Accounting Standards 142*, National Public Radio's *Marketplace*, March 5, 2002.

Brinig, B.P., *Taking Effective Expert Depositions*, State Bar of California, Annual Meeting, Anaheim, CA, 2001, San Diego, CA, 2000 and Monterey, CA, 1998.

Brinig, B.P. (panel moderator), *The Experts on Expert Testimony*, American Institute of CPAs, Advanced Litigation Services Conference, Beverly Hills, CA, 2000.

Brinig, B. P., *Business Damages: Lost Profits or Lost Business Value*, State Bar of California, Annual Meeting, San Diego, CA, 2000 and Monterey, CA, 1998.

Brinig, B.P., *The Court Appointed Expert*, American Institute of CPAs, National Business Valuation Conference, Miami, FL, 2000.

Brinig, B. P., instructor, *Financial Statements in the Courtroom (Business Valuation)*, The National Judicial College, San Francisco, CA, 1998, Reno, NV, 1999 and Laguna Beach, CA, 2000.

Brinig, B. P., *Cutting Edge Divorce Issues: The Business Appraiser as a Jointly Retained Expert*, American Society of Appraisers, 18th Advanced Business Valuation Conference, New Orleans, LA, 1999.

Brinig, B. P. and Wagner, M. J., *Commercial Damages:  A Case Study on Lost Profits*, American Institute of CPAs, Advanced Litigation Services Conference, Tempe, AZ, 1998 and Atlanta, GA, 1999.

Brinig, B. P., *Value of Owner's Services: Theory and Practice*, California CPA Education Foundation, Business Valuation Conference, Los Angeles, CA, 1998.

Brinig, B. P., *The Accounting and Financial Expert:  Developing, Documenting, Presenting and Defending Your Opinion*, American Institute of CPAs, Nat'l Conference on Fraud, Las Vegas, NV, 1998.

Brinig, B. P. and Athy, R. K., *The Business Appraisers' Perspective on the Eminent Domain Process*, CLE International, Eminent Domain Conference, San Diego, CA, 1998.

Brinig, B. P., *Tax Aspects of Marital Dissolutions*, California Center for Judicial Education and Research, San Diego, CA, 1998.

Brinig, B. P. and Friedman, C. H., *Corporations Code §2000:  Special Valuation Rules and Considerations*, California Society of CPAs, Business Valuation Conference, 1998.

Brinig, B. P., *Jointly Retained Business Appraisers*, The Witness Chair, Winter 1996, Issue 5.

Instructor, American Institute of CPAs, Business Valuation Program, course title: *NBV-7 The C.P.A. Valuator - Expert Witness*, 1996 to 1999.



Brinig, B. P., *Developing, Documenting, Presenting and Defending the Business Valuation Opinion in Litigation*, American Society of Appraisers, Advanced Business Valuation Conference, Memphis, TN, October 1996.

Brinig, B. P., *Calculating Net Income Available for Support*, California Center for Judicial Education and Research, 1996.

Brinig, B. P., *Complex Financial Issues in High-End Divorces*, American Academy of Matrimonial Lawyers (Southern California meeting), 1996.

Brinig, B. P., *The Ethics of Expert Witnesses*, <u>The Witness Chair</u>, Vol. I, No. 3, July 1996 (California Society of CPAs).

Brinig, B. P., *Business Valuation Workshop*, California Center for Judicial Education & Research, Monterey, CA, 1995 and Long Beach, CA 1996.

Brinig, B. P., panelist, *New Dimensions in Construction Litigation*, Litigation Services Institute, Las Vegas, NV, March 1996.

Brinig, B. P., panelist, *Proving and Disproving Economic Damages*, Litigation Section of the San Diego County Bar Association, 1995.

Brinig, B. P., *Business Valuations Under Corporations Code §2000*, California Society of CPAs, Litigation Services Conference, 1994.

Brinig, B. P., Pratt, Shannon P. and Fishman, Jay E., *Arbitrating a Small Business Valuation*, American Institute of CPAs, Conference on Litigation Services, Chicago, IL and San Diego, CA, 1993.

Brinig, B. P. and Summers, S. C., *Valuing Professional Practices*, California Society of Certified Public Accountants, 8-hour continuing professional education course, 1992 - 1995.

Brinig, B. P., *The Accountant's Role in Divorce: Valuation of the Small Business and Professional Practice*, American Institute of CPAs, National Conference on Divorce, Chicago, Il, June 1992.

Brinig, B. P., *Calculating Damages in Personal Injury and Wrongful Death Actions*, California Society of Certified Public Accountants, 8-hour continuing professional education course, 1992 - 1995.

Brinig, B. P., *Your Clients are Paying Too Much*, <u>Dicta</u>, Volume 37, No. 10, October 1990.

Brinig, B. P., *Capitalization Rates, Discounts & Premiums in Business Valuation*, American Institute of Certified Public Accountants, Annual Conference on Divorce, Atlanta, GA, June 1990.

*The C.P.A.'s Role In Litigation Support Services*, American Institute of CPAs, Continuing Education Program, San Francisco, CA, May 1989. Lecturer on subject: *Expert Testimony: Depositions and Trial*.

Brinig, B. P. and Prairie, M. W., *Expert Testimony: The Business Appraiser as a Valuation Expert Witness*, <u>Business Valuation News</u>, Volume IV, No. 1, March 1985, pp. 8-24.

McIntyre, M. A. and Brinig, B. P., *Periodic Payments in Medical Malpractice Cases: Effect upon Attorney's Fee Awards*, 8 <u>Trial Bar News</u> 12, April 1985.

Brinig, B. P., *Basic Finance for the Practicing Lawyer*, 3-hour continuing education program, San Diego, CA, Los Angeles, CA, San Francisco, CA, Phoenix, AZ and Tucson, AZ, 1985 - 1993.

Brinig, B. P., *It's Only Money*, 7 <u>Trial Bar News</u> 14, October 1984.



**BRIAN P. BRINIG**

## LIST OF EXPERT TESTIMONY GIVEN
### (F.R.C.P. 26 List)
### TRIALS AND DEPOSITIONS SINCE 1999
#### As of April 30, 2003

The following is a list of expert testimony given by me since 1999. I have made the best effort I can to reconstruct the list accurately from my calendars and billing records. I am not certain that it is absolutely complete, but no item has been knowingly omitted.

**Trial Testimony (1999):**

ARK v. Foster Hotels
Burgoon v. Casa de Bandini
Gonzalez v. Bergelectric
Greenamyer v. Coldwell Banker
Greenleaf v. USA
JLRB v. Jenny Craig
Johnson v. State of California
Lopez v. Sierra Pacific
Martinez v. Strahm Farms
Pressley v. Davison
Tavaglione v. Voss
Thiele v. Merrill Lynch
Trimm v. Sysco

**Deposition Testimony (1999):**

Bennett v. Bayley
Bray v. Elliott
Burgoon v. Casa de Bandini
Chew v. Blockbuster
City v. Pastore
Crittenden v. McDonald & Allen
Greenamyer v. Coldwell Bank
Greenleaf v. USA
Guaranteed v. Newport
Harris v. Losse
Hill v. Center Glass
JLRB v. Jenny Craig
Jester v. Baker & Maxham
Lang v. La Costa
Laughlin v. Malkoff
Ledo v. Summers
Lopez v. Coca-Cola
Lopez v. Sierra Pacific
McBride-Newell v. AirTouch

**Deposition Testimony (1999) Continued:**

Morris v. Coopers & Lybrand
Nelson v. Martinez
Nordhoff v. Truck Insurance
Pet Manager v. Pepper
Schechter v. TWA
Spangler v. Fann
State v. Wilde
Tavaglione v. Voss
Thiele v. Merrill Lynch
Tontini v. Del Mar

**Trial Testimony (2000):**

Alvarez v. Heating
Alvarez v. Imperial
Arya v. M.I.T.
Caliph v. Fisher
Chatas v. Healy
Choulkes v. Icon
Dennstedt v. Southwestern
Gonzales v. Decker
Jabro v. San Diego Port District
Malmstrom v. Pizza Hut
Menas v. Borrego

**Deposition Testimony (2000):**

Alatorre v. Muranaka
Alvarez v. Imperial
Ambu v. Penasquitos
Betty v. Sako
Caccia v. Sofonio
Caliph, Inc. v. Fisher
Cay's v. Gledhill

**43**

**Deposition Testimony (2000) Continued:**

Choulkes v. Icon
Colvin & Shaw v. Hayes
Dennstedt v. Southwestern
Falsetti v. Rancho Bernardo Corp. Ctr.
Freund v. Nycomed
Gonzales v. Decker
Jabro v. San Diego Port District
Jessee v. Muro
Katzeff v. Thomas
Kempster v. Training Directions, Inc.
Lucas v. La Costa
Malmstrom v. Pizza Hut
McQuistion v. Calmat
Menas v. Borrego
Moeller v. Aquatic
Perez v. San Diego Trolley
Poche v. Associated Press
Ramsay v. San Diego Unified School Dist.
Razo v. Best Western
Rhythms v. Lafleur
Roberts v. Faust
Rodriguez v. Kachina
Seecof v. Mohamed
Symsack v. Robinson
Vaughn v. Budget
Visual Marketing v. Alameda

**Trial Testimony (2001):**

Ainsworth v. Fuel Control
Armenta v. Scripps
Beckner v. Barney & Barney
Berke v. Advanced Motor
Brune v. Target
Freeman v. K-Mart
Freund v. Nycomed
Germann v. Vulcan
Loveday v. Harsco
Raney Dissolution
Rogers v. Teo

**Deposition Testimony (2001):**

Ainsworth v. Fuel Control
Andres v. USA
Armenta v. Scripps
Beckner v. Barney & Barney
Berke v. Advanced Motor
Brueggemeyer v. Randt
Carter v. Powell
Chope v. USA
Downey Dissolution
Florin v. IBM
Fountains v. La Jolla Retirement
Germann v. Vulcan
Grover v. Higginson
Hinkle v. Skywest
Internet Magic v. Netfax
Jeremiason v. Woods
Kaa v. Paragon
Lajeunesse v. Ford Motor
Leipart v. Guardian
Liu v. West Coast
Loveday v. Harsco
Magner v. Sears
Mazon v. Fisher Tool
Morris v. SDG&E
Myer v. State Farm
Prigmore v. Mira Costa
Reese v. Chang
Reilly v. Anthony's
Rigney v. Murrell
Rogers v. Teo

**Trial Testimony (2002):**

CPS v. Barney & Barney
Carron v. San Diego Trolley
Hinkle v. Skywest
Internet Magic v. Netfax
Kiley v. Doscher
Lawson v. Armstrong
Liu v. West Coast
Moeller Dissolution
Pacific Regent v. La Jolla
Razo/Bell v. Best Western
Sawyer-Franger v. Praegitzer
USA v. Josephson
Woodard v. Becton

**44**

**Deposition Testimony (2002):**

Access v. The Media Guild
American v. Lehman
Biotech v. Mycogen
Bracamonte v. Jimsair
Brownen v. Reyes
Cabral v. UPS
Carron v. San Diego Trolley
Czarnik v. Illumina
Explorer v. Allstate
Garcia v. Jones
George v. Home Depot
Geraci v. Frantz
Goldman Dissolution
Gonzalez v. Battle
Harron v. Otay Water
Hicks v. MacCulloch
Kiley v. Doscher
Liberty v. Hooters
Murphy v. Security
O'Keefe v. State of California
Pacific Regent v. La Jolla
Pelletier v. Express
Poulter v. Bonner
Redevelopment v. MJK
Rehkopf v. Escondido
Sawyer-Franger v. Praegitzer
Settle v. Destination
Smith v. Williams & Sons
Wachob v. Shaffer
Wells v. MedImpact
Western Pet v. Natura
Winkler v. City of San Diego
Woodard v. Becton

**Trial Testimony (2003):**

Explorer v. Allstate
Kitchens v. Caterpillar
Smith v. Williams & Sons
Western Pet v. Natura

**Deposition Testimony (2003):**

Barno v. County
Basney v. Levitz
Dean v. Symbolic
Montesinos v. Bakersfield
Paulin v. Davenport
Reyes v. Rodenberger
Simms v. Suntory
Tarantino v. DeMaria

45

*Goldstein, et al., vs. Metabolife International, Inc., et al.*
Case No. 01CV387-JM(POR)

**PLAINTIFFS' EXHIBIT LIST**

| EXH. NO. | DATE MARKED | DATE ADMITTED | DESCRIPTION |
|---|---|---|---|
| 1 | | | Metabolife Distributor Application and Agreement of Plaintiff Donald Brown, Jr. (Identified in depositions as Exhibit 1.) |
| 2 | | | Premier Distributorship Agreement of Plaintiff Donald Brown. (Identified in depositions as Exhibit 4A.) |
| 3 | | | Metabolife Distributor Guidelines, circa 1995.  (Identified in depositions as Exhibit 3.) |
| 4 | | | Metabolife Distributor Application and Agreement of Plaintiff Mark Coughlin. (Identified in depositions as Exhibit 31.) |
| 5 | | | Premier Distributorship Agreement of Plaintiff Mark Coughlin. (Identified in depositions as Exhibit 5.) |
| 6 | | | Metabolife Distributor Application and Agreement of Plaintiff Michael Goldstein.  (Identified in depositions as Exhibit 2.) |
| 7 | | | Premier Distributorship Agreement of Plaintiff Michael Goldstein. (Identified in depositions as Exhibit 52.) |
| 8 | | | Premier Distributorship Agreement of Plaintiff Gregory Locke. (Identified in depositions as Exhibit 75.) |
| 9 | | | Metabolife International Inc. Statement of Policies and Procedures, issued January 2000.  (Identified in depositions as Exhibit 30.) |
| 10 | | | Metabolife International, Inc. Independent Consultant Agreement. (Identified in depositions as Exhibit 54.) |



*Goldstein, et al., vs. Metabolife International, Inc., et al.*
Case No. 01CV387-JM(POR)

**PLAINTIFFS' EXHIBIT LIST**

| EXH. NO. | DATE MARKED | DATE ADMITTED | DESCRIPTION |
|---|---|---|---|
| 11 | | | Metabolife International, Inc. Distributor Application and Agreement Addendum.  (Identified in depositions as Exhibit 24.) |
| 12 | | | Metabolife documents reflecting monthly gross sales. |
| 13 | | | Demonstrative chart showing Metabolife monthly gross sales. |
| 14 | | | The series of charts represented as the Arthur Andersen Report (Bates Nos. Metgold 003020-3035). |
| 15 | | | October 15, 1999 letter from Sara Barrington to Don Brown marked as Exhibit 22 (Metgold 001032). |
| 16 | | | July 15, 1999 letter from Claudia Rubens to Erica Pitman marked as Exhibit 18 (last digits of Bates No. illegible). |
| 17 | | | Letter from Karen Nebozny to Erica Pitman dated July 20, 1999 marked as Exhibit 20 (Metgold 001033). |
| 18 | | | June 1, 1998 memoranda from Michael Blevins (Metgold 002729-2731). |
| 19 | | | February 24, 2000 memoranda marked as Exhibit 256 (Metgold 002764). |
| 20 | | | Table entitled "Mark Coughlin 6189" marked as Exhibit 37 (Metgold 005043). |
| 21 | | | Document entitled "Consultant Fee Calculation" (Metgold 005167). |
| 22 | | | Memo from Scott Moberly marked as Exhibit 21 (Metgold 002753-2757). |
| 23 | | | August 1, 2000 memoranda marked as Exhibit 87 (GRL 0000091-92). |
| 24 | | | September 22, 2000 memoranda marked as Exhibit 77 (GRL 0000093). |

47

*Goldstein, et al., vs. Metabolife International, Inc., et al.*
Case No. 01CV387-JM(POR)

**PLAINTIFFS' EXHIBIT LIST**

| EXH. NO. | DATE MARKED | DATE ADMITTED | DESCRIPTION |
|---|---|---|---|
| 25 | | | Letter and attachment to Greg Locke from Scott Moberly (GRL 0000190-192). |
| 26 | | | June 21, 2000 Metabolife Board of Director Meeting Minutes (Metgold 000513). |
| 27 | | | Miscellaneous invoices for purchase of Metabolife (Metgold 000191, 193, 199, and 200). |
| 28 | | | Metabolife International Sales, June to December 2000 marked as Exhibit 258 (Metgold 000136-137). |
| 29 | | | Package of documents dated September 1, 2000 showing dates of orders by retail stores (Metgold 000630-647). |
| 30 | | | August 23, 2000 letter from Sara Barrington to Greg Locke marked as Exhibit 85 (GRL 0000031-32). |
| 31 | | | September 11, 2000 letter from Jeanne Smith to Greg Locke marked as Exhibit 86 (GRL 0000033-34). |
| 32 | | | Memorandum from Michael Ellis announcing the July 2000 meeting marked as Exhibit 23 (DTB 0000067). |
| 33 | | | Metabolife order form showing sales to Albertson's with a purchase order date of July 12, 2000 (Metgold 000192). |
| 34 | | | Project X Forecast Revision No. 1 dated July 11, 2000 marked as Exhibit 261 (Metgold 000629). |
| 35 | | | Memoranda from Scott Moberly (Metgold 002757). |
| 36 | | | September 11, 2000 letter from Jeanne Smith to Don Brown (DTB 0000071-72). |



*Goldstein, et al., vs. Metabolife International, Inc., et al.*
Case No. 01CV387-JM(POR)

**PLAINTIFFS' EXHIBIT LIST**

| EXH. NO. | DATE MARKED | DATE ADMITTED | DESCRIPTION |
|---|---|---|---|
| 37 | | | Excerpted videotapes of Metabolife meetings. |
| 38 | | | Videotape of the ABC 20/20 story on Metabolife, dated 10/15/99. |
| 39 | | | Videotape of the ABC 20/20 story on Metabolife, dated 5/5/00. |
| 40 | | | Collection of Newspaper stories discussing lawsuits filed against Metabolife, regulatory actions against ephedra-based products, criminal background of Defendant Ellis, and potential health risks of ephedra-based products such as Metabolife 356 from 1999 through 2000. |
| 41 | | | Expert Report of Brian Brinig |
| 42 | | | Injunctions filed by Metabolife against "knock-off" competitors |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

3110909_1.DOC

44

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on July 25, 2003, I served the following documents via hand

3  delivery on the following:

4

5        Jeffrey M. Shohet, Esq.
         Mark H. Hamer, Esq.
6        Danielle S. Fitzpatrick, Esq.
         Gray Cary Ware & Freidenrich LLP
7        4365 Executive Drive, Suite 1600
         San Diego, CA 92121-2189
8

9

10                                         _____
                                           Badge #1021; Cty. of San Diego
11

12  3107650_2.DOC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28